UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE S. KIRSCH, | ) | |
| as Shareholders' Representative of | ) | |
| LAWRENCE S. KIRSCH, CHARLES W. | ) | |
| KRIETE, MICHAEL J. CHASE, and | ) | |
| GEORGE PUSZKA, | ) | |
| | ) | No. 12 C 6966 |
| Plaintiff, | ) | |
| | ) | Chief Judge Rubén Castillo |
| v. | ) | |
| | ) | |
| BRIGHTSTAR CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lawrence S. Kirsch, as Shareholders' Representative of Lawrence S. Kirsch, Charles W. Kriete, Michael J. Chase, and George Puszka (collectively "Shareholders"), brings this diversity action against Brightstar Corporation ("Brightstar") alleging common law breach of contract. (R. 1, Compl.) Presently before the Court are Brightstar's motion for partial summary judgment, (R. 117, Def.'s Mot. Summ. J.), and Plaintiff's cross-motion for summary judgment, (R. 124, Pl.'s Mot. Summ. J.). Additionally, Plaintiff moves to strike some of Brightstar's responses to Plaintiff's statement of facts. (R. 174, Pl.'s Mot. to Strike Resp.) For the reasons stated below, the Court grants in part and denies in part Brightstar's motion for partial summary judgment, and grants in part and denies in part Plaintiff's motion for summary judgment. The Court also denies as moot Plaintiff's motion to strike.

# RELEVANT FACTS[1]

Before summarizing the facts of this case, the Court first addresses Plaintiff's motion to strike several of Brightstar's responses to Plaintiff's Local Rule 56.1 statement of facts. (R. 174, Pl.'s Mot. to Strike Resp.) Local Rule 56.1 requires the non-movant's response to the movant's statement of facts to contain, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon[.]" L.R. 56.1(b)(3)(B). Plaintiff argues that more than half of Brightstar's responses to his statement of facts violate Local Rule 56.1(b)(3)(B) because they are argumentative, fail to cite to the record, or assert new facts. (R. 174, Pl.'s Mot. to Strike Resp.) The Court has carefully reviewed and considered Plaintiff's objections. To the extent that any of Brightstar's responses are argumentative, conclusory, or fail to cite the record, the Court disregards them. *See Greene v. CCDN, L.L.C.*, 853 F. Supp. 2d 739, 744 (N.D. Ill. 2011). To the extent that any of Brightstar's responses contain new facts that do not specifically refute Plaintiff's fact statement to which they are responsive, the Court disregards the new facts. *Id.* Accordingly, Plaintiff's motion to strike is denied as moot.

---

[1] The Court takes the facts from the parties' Local Rule 56.1 statements of material facts. (R. 120, Def.'s Local Rule 56.1 Statement of Material Facts ("Def.'s Facts"); R. 127, Pl.'s Local Rule 56.1 Statement of Material Facts ("Pl.'s Facts"); R. 146, Def.'s Resp. to Pl.'s Local Rule 56.1 Statement of Material Facts ("Def.'s Rule 56.1 Resp.") & Def.'s Statement of Additional Facts in Response to Pl.'s Mot. Summ. J. ("Def.'s Add'l Facts"); R 151, Pl.'s Resp. to Def.'s Local Rule 56.1 Statement of Material Facts ("Pl.'s Rule 56.1 Resp."); R. 152, Pl.'s Statement of Additional Facts ("Pl.'s Add'l Facts"); R. 164, Def.'s Resp. to Pl.'s Statement of Additional Facts ("Def.'s Resp. Add'l Facts"); R. 170, Pl.'s Resp. to Def.'s Statement of Additional Facts ("Pl.'s Resp. Add'l Facts"); R. 191, Pl's Resp. to ¶¶ 42-82 of Def.'s Local Rule 56.1 Statement of Material Facts ("Pl.'s Add'l Rule 56.1 Resp.").)

## I. Background

Shareholders are all individuals residing in Illinois or New Hampshire, and Brightstar is a Delaware corporation with its principal place of business in Florida. (R. 146, Def.'s Rule 56.1 Resp. ¶ 1.) Brightstar was founded in 1997 by Marcelo Claure, and is currently the world's largest wireless device distribution company. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 2.) Brightstar's main business is to distribute wireless devices to the "telecom channel," which means retailers, wireless carriers who maintain their own retail stores, and small dealers. (*Id.*)

Shareholders collectively owned all of the stock of OTBT, Inc. ("OTBT").[2] (*Id.* ¶ 3.) In 2010, OTBT was a small technology startup whose business was selling and activating cell phones, accessories, devices, and plans through U.S.-based information technology ("IT") resellers. (*Id.* ¶ 4.) OTBT's target market was non-consumer resellers, that is, resellers whose primary customers were not retail, but rather institutional, such as businesses, governments, or health care facilities. (*Id.*) On August 31, 2010, OTBT was purchased by Brightstar pursuant to a Stock Purchase Agreement ("SPA"). (*Id.* ¶ 3.) Plaintiff was the largest pre-acquisition shareholder and acts as representative of all Shareholders for purposes of this suit. (*Id.*) Shareholder Charles Kriete was OTBT's president at the time of the acquisition and worked for OTBT while it was owned by Brightstar. (*Id.*)

Similar to Brightstar, Tech Data Corporation ("Tech Data") focuses on distribution and logistics; however, unlike Brightstar, Tech Data's primary business is the sale and distribution of IT products (computers, servers, printers, etc.) to resellers and other companies operating in what is referred to as the "IT channel." (*Id.* ¶ 7.) The IT channel consists of resellers that primarily

---

[2] OTBT's name was changed to ActivateIT, and then to TDMobility. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 3.) For the sake of clarity, the Court will refer to the entity as OTBT throughout this opinion.

service institutional end customers, not consumers. (*Id.*) The IT channel includes value added resellers ("VARs"), which are resellers who sell IT products to customers that are typically businesses (small, medium, or enterprise), governments, or health care institutions. (*Id.* ¶ 8.) An "IT reseller" can also refer to a VAR. (*Id.*) However, depending on the context, VAR can have a broader meaning as well, such as any technology reseller. (*Id.*)

The dispute in this suit involves Brightstar's alleged breaches of certain provisions of the SPA. The SPA dictates that Brightstar, as part of OTBT's purchase price, will pay Shareholders an amount (the "Earn-Out") that is based upon OTBT's performance during a subsequent one-year period. The SPA outlines specific requirements for calculating the Earn-Out, and the parties disagree over whether Brighstar followed those requirements and properly calculated the Earn-Out.

## II.     Brightstar's Interest in OTBT

In late 2009, Patrick Stokes was hired by Brightstar to help grow the U.S. business, and one growth strategy he focused on was developing sales to enterprise customers. (R. 146, Def.'s Rule 56.1 Resp. ¶ 12.) Stokes helped launch Brightstar's enterprise group, which Brian Corey became president of in 2010; the role of the group was to assess the services Brightstar could provide to VARs whose primary end customers were businesses or governments. (*Id.* ¶¶ 13-14; R. 170, Pl.'s Resp. Add'l Facts ¶ 6.) At the same time, Brightstar was also investigating new lines of business altogether, particularly wireless activation services. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 9.)

In January 2010, Brightstar and Shareholders began discussing a possible acquisition of OTBT. (*Id.* ¶ 10; R. 164, Def.'s Resp. Add'l Facts ¶ 6.) OTBT's greatest assets to Brightstar at that time were: (1) its software platform called CellManage; (2) its wireless carrier contracts

(a.k.a. activation agreements) with three U.S. carriers, which allowed wireless plans to be activated by VARs and their customers via OTBT's software platform; and (3) its employees, particularly Shareholders Kriete and Michael Chase. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 5; R. 164, Def.'s Resp. Add'l Facts ¶ 4.) Activation agreements were very challenging to obtain and were hugely valuable. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 6.) None of OTBT's carrier contracts included territories outside of the United States. (*Id.*) Additionally, OTBT had no reseller customers outside of the United States. (*Id.*)

According to Shareholder Kriete, Shareholders were at first reluctant to consider Brightstar as an acquirer because Brightstar's focus was seen as consumer- and retail-oriented, and Brightstar did not have access to the channel that OTBT required to scale the business. (*Id.* ¶ 10; R. 146, Def.'s Rule 56.1 Resp. ¶ 19.) Shareholder Kriete expressed these concerns to Stokes at an initial dinner meeting, and Stokes told Kriete about Brightstar's existing joint venture with Tech Data in Europe. (R. 146, Def.'s Rule 56.1 Resp. ¶¶ 19, 21.) Tech Data did business in the IT channel, like OTBT, and so the possibility of a joint venture between Brightstar and Tech Data, which would include the acquisition of OTBT, was discussed. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 10.) Tech Data had access to the kinds of customers OTBT targeted, while Brightstar had access to a mobility product and a distribution infrastructure that Tech Data did not have; neither had a software platform or the carrier contracts necessary to sell activated mobile devices to enterprise customers in the IT channel in the United States. (*Id.* ¶ 11.) Shareholder Kriete believed a joint venture involving OTBT could potentially augment the existing relationship between Brightstar and Tech Data by providing access to business opportunities in the United States that Brightstar did not then have, namely selling to resellers in the IT channel. (*Id.* ¶ 13.)

This led Shareholders to conclude that an acquisition deal that included a partnership between Brightstar and Tech Data might be a good fit. (*Id.* ¶ 11.)

## III. SPA Negotiations and the Earn-Out Provision

In April 2010, Brightstar's attorneys drafted a letter of intent reflecting that Brightstar sought to purchase all of the outstanding capital stock of OTBT. (R. 146, Def.'s Rule 56.1 Resp. ¶ 25.) The final version of the letter of intent, dated June 10, 2010, stated that Brightstar would like to purchase OTBT for a total purchase price of $1 million plus debt obligations and payment of a performance-based Earn-Out. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 26.)

According to Corey, who led the negotiations for Brightstar, Shareholder Kriete and Plaintiff were concerned about how the performance-based Earn-Out would be calculated. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 14.) Plaintiff testified in his deposition that one of his main concerns about the Earn-Out was that Brightstar might "play games" by routing sales that should have rightfully been OTBT's through its other subsidiaries and affiliates in order to avoid paying Shareholders their fair Earn-Out. (*Id.*) Plaintiff wanted a provision in the SPA that would protect Shareholders from that possibility. (*Id.* ¶ 15.) Corey testified in his deposition that Brightstar was willing to provide assurances to Shareholders that revenue fairly belonging to OTBT would stay with OTBT. (*Id.* ¶ 16.) Corey agreed that if sales were made to an IT channel customer and activated through OTBT, but OTBT did not actually record the sale for whatever reason, OTBT would still get credit for the sale. (*Id.*) Corey testified that Brightstar was selling extensively to non-VAR customers at the time of the acquisition; the protection provided to OTBT would be for business OTBT was bringing to the table, namely, sales to resellers with primarily business customers. (*Id.* ¶ 17.)

On June 25, 2010, Brightstar sent Shareholders a first draft of the SPA. (*Id.* ¶ 18.) Several drafts of the SPA were exchanged between the parties and their attorneys with changes being made to the representation and warranty language (the "Representation and Warranty") in the Earn-Out Provision. (*Id.* ¶¶ 18-23). The final version of the original SPA was executed by both parties on August 31, 2010, and the transaction closed and payment was made on October 1, 2010. (R. 146, Def.'s Rule 56.1 Resp. ¶ 47.) The Earn-Out Provision in Section 2.1(c) of the SPA provides:

> [Brightstar] shall pay to the Shareholders a performance based earn-out (the "**Earn-Out**") which shall be deemed additional Purchase Price when paid in accordance with the following:
>
> > (i) The Earn-Out shall be linked to tiered milestones of [OTBT's] GAAP-reported revenue ("**Revenues**") and EBITDA derived from any and all sales including, but not limited to, all handsets, information technology devices (including laptops, tablets, netbooks, etc.), accessories, activation commission, airtime, and other ancillary service revenue derived through the following channels: Tech Data channel partners, additional IT product distributor relationships such as Ingram Micro or Synnex, and current and future direct [OTBT] and/or [Brightstar] IT reseller channel partners (including wireless carrier partners that utilize [OTBT] for back office support, such as billing on behalf of or activation services) with primary end customers in the commercial (small-medium-large business or enterprise), health care, and government (state, local, education, and federal) markets, for the twelve (12) month period commencing on April 1, 2011 and ending on March 31, 2012 (the "**Earn-Out Period**") as shown on [OTBT's] financial statements as adjusted pursuant to Section 2.1(c)(ii) below. [Brightstar] represents and warrants that, except as set forth in Section 2.1(c)(ii) below, prior to March 31, 2012, neither [Brightstar] nor any of its Affiliates (except [OTBT]) will directly or indirectly sell any products or services which would generate Revenue.

(R. 151, Pl.'s Rule 56.1 Resp. ¶ 25.)

Plaintiff testified that in his view, for a sale to be counted toward OTBT's "Revenue" if not actually made by OTBT, it would have to go through one of the channel partners identified in the Earn-Out Provision, to a reseller, who would have to have primary end customers in the

commercial, health care, or government markets; consumers are not listed as primary end customers in the Earn-Out Provision. (*Id.* ¶ 26.) Plaintiff testified that no one from Brightstar informed him that Brightstar intended to route business opportunities already in place in Europe or Latin American through OTBT. (*Id.* ¶ 27.) Plaintiff never told Brightstar that was his expectation, and he also knew of no one from OTBT who expressed such an expectation. (*Id.*) Plaintiff testified that he "never said [Brightstar] [was] required to route" existing business to OTBT; the complaint, however, alleges that Brightstar was required to route sales to OTBT. (*Id.* ¶ 29.) Shareholder Kriete did not recall informing Brightstar that he expected the activities of any Brightstar affiliate outside the United States to result in revenue credited to OTBT for purposes of the Earn-Out. (*Id.* ¶ 30.) Shareholder Kriete also could not recall if anyone from Tech Data had suggested that Brightstar Europe ("BEL") or other Tech Data revenue would count towards the Earn-Out. (*Id.*)

The Representation and Warranty makes specific reference to Brightstar's Affiliates, and "Affiliate" is defined in the SPA as follows:

> "**Affiliate**," as applied to any Person, means any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" . . . as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting Securities or by contract or otherwise. For purposes of this definition, a Person shall be deemed to be "controlled by" a Person if such Person possess, directly or indirectly, power to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person.

(R. 146, Def.'s Rule 56.1 Resp. ¶ 34.) "Person" is defined as including natural persons and corporations. (*Id.*) Claure, Brightstar's CEO, testified that the Representation and Warranty "[p]retty much [] says that [Brightstar and its Affiliates] will not compete with the product that OTBT has, which in [his] opinion would be activation services or [] billing . . . ." (*Id.* ¶ 36.)

8

The Earn-Out is calculated based on the SPA definition of EBITDA (earnings before interest, taxes, depreciation, and amortization). (R. 146, Pl.'s Rule 56.1 Resp. ¶ 43.) Beyond the common usage of the term EBITDA, the parties negotiated several "add-backs" and/or qualifications of expenses that could be assigned to OTBT and computed in the calculation of the EBITDA:

> **"EBITDA"** means, without duplication, calculated in each case in accordance with GAAP, the sum of (i) net income, plus (ii) interest expense to the extent deducted in computing net income, plus (iii) charges against income for foreign, federal, state and local taxes to the extent deducted in computing net income, plus (v) amortization expense, including, without limitation, amortization of goodwill and other intangible assets to the extent deducted in computing net income. The calculation of EBITDA for purposes of this Agreement shall not include expenses related to (y) the retention portion of the Earn-Out accrual plus any additional compensation paid to a Shareholder for taxes attributable to the Earn-Out or (z) bonuses including, but not limited to, variable compensation, payable to individuals whose compensation is included in the calculation of EBITDA including, but not limited to, former Company executives which, for purposes of this Agreement includes any compensation in excess of accepted base salary industry standards. However, business operating expenses allocated to [OTBT's] business based on a reasonable allocation by Purchaser consistent with allocations to Purchaser's other subsidiaries shall be included in the calculation of EBITDA.

(*Id.* ¶ 44.)

## IV. The Quartering Provision and Formation of the Joint Venture with Tech Data

Section 2.1(c)(iii) of the original SPA provided a schedule of revenue thresholds, and corresponding EBITDA caps, which would apply to the Earn-Out calculation. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 31.) If, during the Earn-Out period, OTBT received at least the gross revenue set forth in Column A, then the Earn-Out was set to be OTBT's EBITDA up to the cap specified in Column B:

| Column A (Revenues Threshold) | Column B (EBITDA Cap) |
| --- | --- |
| $20 million | $0.5 million |
| $30 million | $1.0 million |
| $40 million | $1.5 million |
| $50 million | $2.0 million |
| $60 million | $2.5 million |
| $70 million | $3.0 million |
| $80 million | $3.5 million |
| $90 million | $4.0 million |
| $100 million | $4.5 million |
| Over $100 million | $5.0 million |

(*Id.*) Section 2.1(c)(iv)(y) of the SPA (the "Quartering Provision") provides:

> [Brightstar] further acknowledges and agrees that if it does not enter into a joint venture or similar relationship with one of the JV Partners (the "JV Relationship") on or prior to March 31, 2011 . . . the Earn-Out table set forth in Section 2.1(c)(iii) above shall be modified by dividing each of the Revenue Thresholds set forth in Column A by four (4) and leaving the corresponding EBITDA Cap set forth opposite such Revenue Threshold as is.

(*Id.* ¶ 32).

Throughout the entirety of the negotiations of the SPA, the parties discussed and intended that Brightstar would form a joint venture ("JV") with Tech Data to run OTBT. (R. 146, Def.'s Rule 56.1 Resp. ¶ 38.) The intended focus of the JV would be Tech Data's IT channel/VAR customers in the United States; Tech Data had already been selling IT products to these resellers, and Brightstar brought the ability to sell mobility products to these customers, while OTBT would provide the bundled activation services which neither parent company had at that time. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 33.)

After the SPA was executed, Brightstar and Tech Data quickly began working toward forming a JV to jointly own OTBT. (*Id.* ¶ 34.) By October 15, 2010, a steering committee for the JV had been established, and additional steering committee meetings were held thereafter. (*Id.* ¶ 35.) The Shareholders' Agreement between Brightstar, Tech Data, and OTBT (the "JV

Shareholders' Agreement"), relating to the operation of OTBT, was executed on March 23, 2011. (*Id.* ¶ 36.) The JV Shareholders' Agreement identified the operating territory for the JV as the 50 United States and Puerto Rico. (R. 153, Sealed Pl.'s Rule 56.1 Resp. ¶ 36.) Fully executed copies of both the JV Shareholders' Agreement and the Stock Purchase Agreement between Tech Data and Brightstar (the "JV SPA") were circulated on March 28, 2011. (R. 151, Pl.'s Rule 56.1 Resp. *Id.* ¶ 36.) The JV SPA specified that the transaction would close by April 29, 2011. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 59.) Tech Data, Brightstar, and OTBT executed their Services Agreement on September 16, 2011. (*Id.* ¶ 63.) The Services Agreement set forth the contributions both Tech Data and Brightstar would make to the JV and specified what operating expenses would be charged to the JV. (*Id.* ¶ 64.) The Services Agreement provided that Tech Data and Brightstar could charge OTBT for services provided to OTBT, such as employee's services and IT services, as well as management fees. (*Id.* ¶¶ 65-66.) The Services Agreement also stated that the JV Shareholders' Agreement was effective as of April 29, 2011. (R. 166, Sealed Def.'s Resp. Add'l Facts ¶ 19.)

On April 11, 2011, Shareholder Kriete e-mailed Mike Reilly, Brightstar's director of finance of global enterprise, to inquire whether Reilly had an issue "starting the hiring/onboarding process for the JV," before the agreement officially closed. (R. 166, Sealed Def.'s Resp. Add'l Facts ¶ 12.) When Shareholder Chase questioned whether OTBT's website should reference Tech Data, Corey responded: "In less than 10 days when we officially close we can mention [Tech Data] . . . . Until then, look and feel like bstarcorp.com with as little content as possible." (*Id.* ¶ 14.) On April 26, 2011, Brightstar's attorney, Christopher Tillson, wrote to Shareholder Kriete about his "preparation[s] for the implementation of [the OTBT] joint venture." (*Id.* ¶ 16.) On May 1, 2011, Shareholder Chase asked Corey what they should put up

on OTBT's website now that the JV is "official." (*Id.* ¶ 17.) Lastly, in a July 2011 e-mail, Reilly stated that the JV "started in May." (*Id.* ¶ 18.)

## V.    The Second Amendment to the SPA

During negotiations for the JV with Brightstar, Tech Data stated that it would not run its laptop sales through the JV. (R. 146, Def.'s Rule 56.1 Resp. ¶ 55.) Jeremy Evans, Tech Data's director of corporate development, explained in his deposition that routing sales of Tech Data's laptops through OTBT was not financially viable for tax reasons. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 38.) On March 12, 2011, Reilly contacted Shareholders via e-mail to propose a revised schedule for calculating the Earn-Out under the SPA. (*Id.*) In his e-mail, Reilly explained that contrary to prior assumptions, OTBT would not be credited with revenue from sales of laptops made through Tech Data, although OTBT would be credited with activation commissions. (*Id.*) "To account for this loss of revenue," Brightstar offered to reduce the revenue thresholds stated in Section 2.1(c)(iii) of the SPA by 21.3%, based on the previous assumption in the JV financial models that laptop sales would account for 21.3% of OTBT's revenues. (*Id.*; R. 166, Sealed Def.'s Resp. Add'l Facts ¶ 24.) Corey testified that the offered amendment was to "make up for the fact that [Brightstar] couldn't get laptop revenue to be credited." (R. 166, Sealed Def.'s Resp. Add'l Facts ¶ 24.)

In a March 23, 2011 e-mail, Plaintiff appeared to object to Brightstar's proposed amendment, claiming that the Earn-Out Provision of the SPA spells out in great detail that Brightstar will need to incorporate Tech Data laptop revenue in any Earn-Out calculation. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 39.) Corey then arranged a call with Plaintiff to explain why the amendment would be "good for" Shareholders. (*Id.*) Shortly thereafter, Plaintiff asked Brightstar to draft the language for the amendment. (*Id.*)

The Second Amendment to the SPA ("Second Amendment") was executed on March 31, 2011, and provides that Section 2.1(c)(iii) of the SPA is amended with a new schedule of revenue and EBITDA:

| Column A (Revenues Threshold) | Column B (EBITDA Cap) |
|---|---|
| $15.7 million | $0.5 million |
| $23.6 million | $1.0 million |
| $31.4 million | $1.5 million |
| $39.3 million | $2.0 million |
| $47.2 million | $2.5 million |
| $55.1 million | $3.0 million |
| $63 million | $3.5 million |
| $70.8 million | $4.0 million |
| $78.7 million | $4.5 million |
| Over $78.7 million | $5.0 million |

(*Id.* ¶ 40.) The Second Amendment does not make any other substantive changes to the SPA. (*Id.*)

The Second Amendment does not provide any benefit to Brightstar, or new obligation by Shareholders, not already contained in the SPA. (*Id.* ¶ 41.) Plaintiff testified that in his view, the Second Amendment does not provide for the exclusion of laptop sales in the calculation of OTBT's Revenue. (*Id.*) Plaintiff could not articulate any reason the Second Amendment benefitted Brightstar; he instead stated, "Thank you Brightstar, I guess," and replied that he could not "be responsible if people don't pay attention to detail." (*Id.*) Shareholder Kriete likewise would not acknowledge any reason for Brightstar to reduce the revenue thresholds in the Second Amendment. (*Id.*) Shareholder Chase also could not identify what Brightstar received in exchange for agreeing to reduce the revenue thresholds. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 42.) In his answers to Brightstar's interrogatories, Plaintiff cited nothing Brightstar received for the Second Amendment and stated that he agreed to the Second Amendment because it contained no objectionable language. (*Id.* ¶ 43.) Also in his answers to Brightstar's

interrogatories, Plaintiff asserted that Tech Data's laptop sales should have been included in OTBT's Revenue for purposes of the Earn-Out. (*Id.*)

Revenues from Tech Data's laptop sales were not included in OTBT's Revenue. (R. 164, Def.'s Resp. Add'l Facts ¶ 27.) OTBT was credited with the activation commission for those sales, however, if the laptops were activated. (*Id.*)

## VI. Operation of OTBT as a Joint Venture

Claure testified that after acquiring OTBT, Brightstar's enterprise group was rolled into the OTBT JV with Tech Data. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 44.) Corey was the President of the JV until his departure in September 2011. (*Id.*) On September 21, 2010, Brightstar issued a press release entitled "Brightstar Enters Activation Business in the United States by Acquiring OTBT." (*Id.* ¶ 46.) The press release states: "In addition to the core offering and activation services, Brightstar will also be able to provide U.S.-based VARs with data devices, software, hardware, accessories, technical support, billing management, asset management, training services, and installation services." (*Id.*) Corey is quoted in the press release, saying that while Brightstar launched a European presence in 2007 to attempt to sell to the IT reseller channel, the "acquisition of OTBT is a great first step for our United States presence." (*Id.*)

As a joint venture, OTBT's focus was on United States customers. (*Id.* ¶ 45.) Evans testified that there was no question that Shareholders Kriete and Chase were aware that the intended scope of the JV was the United States and Puerto Rico. (*Id.*) In an April 4, 2011 Brightstar press release entitled "Tech Data and Brightstar Announce U.S. Joint Venture: [OTBT]," Shareholder Kriete is quoted as follows: "Brightstar and Tech Data bring a new level of wireless distribution expertise in the U.S. market with an offering that is completely unique in

this space." (*Id.* ¶ 47.) Also in the press release, Tech Data's CEO states, "We are thrilled to be partnering again with Brightstar to form this U.S.-based joint venture, and to accelerate our participation in the U.S. mobility market." (*Id.*) Further, the press release states that OTBT will offer Tech Data's U.S.-VARs a centralized and customized service. (*Id.*)

Shareholder Kriete testified that he and the other Shareholders discussed taking OTBT globally during their initial meetings with Brightstar, and that during the Earn-Out period some attempts were made to take the OTBT platform outside the United States. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 50.) In late 2010, Corey had hopes of using OTBT's software and business model globally. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 49; R. 166 Sealed Def.'s Resp. Aff'l Facts ¶ 10.) However, Kriete testified that as of the date of his deposition, the software platform was still not ready to be taken globally. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 50.) Kriete believed that the reason the software had not been used globally was due to the delay in implementing the platform by both Brightstar and Tech Data. (*Id.* ¶ 51.) Corey likewise testified that by the time he left Brightstar in September 2011, there had been no use of OTBT's personnel or software platform outside of the United States, nor was OTBT's platform usable outside the United States. (*Id.*) Corey explained that if the OTBT platform had proven successful in the United States, he would have tried to expand it outside the United States. (*Id.* ¶ 52.) Claure, Brightstar's CEO, also testified that OTBT could be taken globally only after it was a proven success in the United States. (*Id.*)

A Brightstar June 27, 2011 S-1 statement filed with the Securities and Exchange Commission ("SEC") describes Brightstar's "Government and VARS Services," which includes: (1) acting as the master agent, where it activates wireless devices; (2) providing a customized billing platform; and (3) distributing and selling software products. (*Id.* ¶ 48; R. 164, Def.'s

15

Resp. Add'l Facts ¶ 1.) Claure testified that this section of the SEC statement referred to the services Brightstar intended to provide via the OTBT JV. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 48; R. 164, Def.'s Resp. Add'l Facts ¶ 1.)

Claure testified that OTBT was "tremendously underperforming" during the Earn-Out period. (*Id.* ¶ 54.) Dimitry Izotov, an accounting manager for OTBT, testified that prior to adding back certain expense items required by the SPA for purposes of the Earn-Out, OTBT had a net loss during the Earn-Out period. (*Id.*) OTBT's financial projections were lowered for future years, principally because of the decline of the RIM Blackberry (a staple product of OTBT) and the trend of companies to allow "bring your own device," which "virtually eliminate[d] one of the value adds that OTBT originally brought to the table." (R. 192, Sealed Pl.'s Add'l Rule 56.1 Resp. ¶ 54.) Claure concluded that mobility products are incompatible with the corporate IT channel. (*Id.*)

## VII.   BEL

Brightstar Europe, Limited ("BEL") was a joint venture formed between Tech Data and Brightstar in April 2007 to facilitate the distribution of mobility-related products in the European markets; it was not an operating company and thus had no direct sales. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 64.) Actual sales were made entirely through Tech Data's European subsidiaries. (*Id.*) BEL's revenue was consolidated on Tech Data's financial statements. (*Id.*) Claure testified that Brightstar's ownership interest in BEL was akin to an investment. (*Id.* ¶ 65.) Brightstar does not report revenues from Europe on its financial statements and instead accounts for profits from BEL as an investment, reported as "other income (expenses)." (*Id.*) On its May 23, 2011 S-1 statement filed with the SEC, Brightstar stated that it invested $10 million in exchange for a 50% ownership interest in BEL. (*Id.*) On its June 27, 2011 S-1 statement filed

with the SEC, Brightstar stated that it conducted business in Europe through BEL, "a joint venture company formed in 2007, which is owned equally and controlled jointly with Tech Data and [Brightstar]." (R. 164, Def.'s Resp. Add'l Facts ¶ 38.) Brightstar and Tech Data each appointed three members to BEL's Board of Directors; directors were not appointed via voting of the shares. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 66.) Claure was the Chairman of BEL's Board of Directors. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 11.) Corey testified that BEL's employees, however, were controlled by Tech Data and that Brightstar did not dictate BEL's activities. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 66.)

BEL was Brightstar's first entry into Europe. (*Id.* ¶ 67.) Claure testified that the vast majority of what BEL did was sell Brightstar's "telecom products" (mobility products such as phones and tablets) and Tech Data's IT products (such as laptops) to the "telecom channel," i.e., mobile carriers, retailers, and dealers. (*Id.*) BEL was very successful in this regard. (*Id.*) Only certain Tech Data company sales were to be reported through BEL—sales of IT products to the telecom channel, sales of mobility products to the telecom channel, and sales of telecom products to the IT channel. (*Id.* ¶ 68.) Sales of IT products through the IT/VAR channel were specifically excluded because that was Tech Data's "bread and butter" business. (*Id.*) Brightstar's June 27, 2011 S-1 statement filed with the SEC states that BEL's "core services in the region include value-added distribution, government and VARs, and consumer services." (*Id.* ¶ 69.) Claure testified, however, that the vast majority of BEL's profits—in excess of 99%—came from sales to the telecom channel, not the IT/VAR channel. (*Id.*) Claure stated that BEL was never able to generate many sales of telecom products to the IT/VAR channel. (*Id.*) Corey likewise testified that in 2010, BEL was only selling to a small number of VARs at all; he believed that sales to IT channel VARs primarily with business customers, if any, were immaterial. (*Id.*) Claure testified

that Brightstar, through BEL, OTBT, or otherwise, has never been successful in taking telecom products into the IT VARs. (R. 192, Sealed Pl.'s Add'l Rule 56.1 Resp. ¶ 71.) He testified, "I can look you straight in the eye and tell you that miserably failed. We have not been able to do that in the U.S., Europe, Latin American, Asia, nowhere." (*Id.*)

A January 2012 Tech Data company profile states that "[t]hrough [BEL], the company distributes mobile phones and other wireless devices to a variety of customers including mobile operators, dealers, agents, retailers and e-tailers in certain European markets." (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 70.) Further, at a conference in 2014, a Tech Data executive explained that "the opportunity [Tech Data] attacked [with BEL] was distributing phones to those retail outlets in Europe." (*Id.*)

BEL's sales of mobility-related products during the Earn-Out period totaled €1,306,638,510.11 ($1,688,497,827.00), broken down as follows: (1) sales in Austria were €67,201,592.00; (2) sales in Belgium were €83,132,766.00; (3) sales in the Netherlands were €328,879,679.00; and (4) sales in the remaining European counties were €827,424,473.00. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 90.) Izotov testified that he never discussed BEL as it related to OTBT with Shareholders Kriete and Chase, and that the three never discussed or analyzed any of the revenues reported through BEL. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 53.)

Eventually, Tech Data bought out Brightstar's 50% ownership in BEL. (*Id.* ¶ 74.) Despite failing to sell telecom products to the IT channel, BEL was considered a great success in selling products to the retail/telecom channel, and Tech Data planned to expand those operations. (*Id.*)

## VIII. Best Buy and Best Buy for Business

Brightstar does significant business with Best Buy, a nationally known retailer. (*Id.* ¶ 76.) Best Buy has no means of tracking the end users of products sourced by Brightstar to Best Buy. (*Id.*) Brightstar does not deal directly with and is not a fulfillment partner for "Best Buy for Business," the enterprise-focused group within Best Buy. (*Id.*) However, OTBT has done some business directly with Best Buy for Business.

## IX. The Earn-Out Calculation and Filing of the Lawsuit

Izotov, a Tech Data employee, began working for OTBT as an accounting manager. (R. 146, Def.'s Rule 56.1. Resp. ¶ 70.) Under the SPA, Brightstar was required to "prepare the Applicable Financials in good faith and to deliver them to the Shareholder Representative." (*Id.* ¶ 72.) In February 2012, Plaintiff e-mailed Izotov asking to review OTBT's financials for the nine-month period ending December 2011 in relation to the Earn-Out. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 55.) On February 24, 2012, Izotov provided Plaintiff and Shareholder Kriete a preliminary calculation, showing that OTBT had $7,614,000.00 in revenue and -$153,000.00 in EBITDA for the nine-month period. (R. 192, Sealed Pl.'s Add'l Rule 56.1 Resp. ¶ 55.) The balance sheet Izotv provided did not attribute to OTBT any revenues originating from BEL or Brightstar's global Affiliates. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 55.) Izotov testified that Shareholder Kriete, who had access to OTBT's financial information during the entire relevant period, never objected to BEL or Affiliate revenue not being reported on OTBT's books. (*Id.*) Kriete stated in his affidavit that he did not raise concerns about sales and other revenue being handled outside of OTBT because he was an employee of OTBT; Plaintiff, as Shareholder Representative, was supposed to handle any issues so that Kriete's employment would not be affected. (R. 164, Def.'s Resp. Add'l Facts ¶ 34.)

On June 27, 2012, Mike Cost, on behalf of Brightstar, sent a letter to Plaintiff, providing him with OTBT's official earnings statement for the twelve-month Earn-Out period, and informing him that, as defined by the SPA, OTBT's gross revenue was $16,867,000.00, and EBITDA was $226,000.00; the Earn-Out amount Shareholders were entitled to was thus $226,000.00. (R. 192, Sealed Pl.'s Add'l Resp. ¶ 56.) Izotov performed this Earn-Out calculation. (R. 146, Def.'s Rule 56.1 Resp. ¶ 72.) After Izotov prepared the Earn-Out calculation, it was reviewed by Brightstar's Vice President of Finance Bjorn Rektorli, Brightstar's counsel Brad Romig, and Cost. (R. 171, Sealed Pl.'s Resp. Add'l Facts ¶ 8.)

The Earn-Out calculation did not include credit for revenues originating from BEL or Brightstar's global Affiliates. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 57.) When calculating the Earn-Out, Izotov did not inquire from anyone at Brightstar whether it had any "Relevant Sales" that should be included in the Earn-Out. (R. 146, Def.'s Rule 56.1 Resp. ¶ 73.) When calculating the Earn-Out, Izotov did not add back any variable compensation or bonuses because he and Brightstar viewed it as being within industry standards to pay sales commissions and bonuses. (*Id.* ¶ 75.) Joseph Kalinoski, Brightstar's corporate representative, testified that he was not aware of any specific analysis that was performed by Brightstar of the base salaries paid to OTBT employees for purposes of determining whether they met or exceeded industry standards. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 76.) When calculating the Earn-Out, Izotov did not compare the business operating expenses Brightstar allocated to its Affiliates. (*Id.* ¶ 78.) However, according to Brightstar, it did not allocate any of its operating expenses or overhead to OTBT. (*Id.* ¶ 79.) Kalinoski testified that the allocations of general operating expenses were "de minimis," being approximately .05% of OTBT's revenue. (*Id.* ¶ 80.) During the Earn-Out

period, OTBT paid Brightstar U.S. and Tech Data $2,961,737.00 for various fees and charges. (*Id.* ¶¶ 81-82.)

Throughout July 2012, Plaintiff requested from Izotov a number of items regarding OTBT's financial information. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 58.) Plaintiff testified that Izotov made "a good effort" to provide him the requested information. (*Id.*) Izotov also provided Plaintiff information obtained from Brightstar's human resources department. (*Id.*) Izotov testified that at a meeting on August 10, 2012, Plaintiff informed Izotov for the first time that he believed all of Brightstar's earnings relating to BEL should have been included in the Earn-Out calculation, and Izotov found this "shocking." (*Id.* ¶ 59.) According to Izotov, prior to that time, Plaintiff had not requested any information about BEL or Brightstar's global Affiliates' sales. (*Id.*)

After Plaintiff challenged the Earn-Out calculation, Izotov added in the variable compensation and came up with a new Earn-Out amount of $554,000.00. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 85.) Izotov explained that he computed this hypothetical amount and left it on the books as an accrual of potential liability if Plaintiff's arguments regarding variable compensation were later accepted. (*Id.*) This new Earn-Out was never disclosed to Shareholders. (*Id.*)

Plaintiff began communicating with Cost in August 2012, and continued to assert that the financial information provided by OTBT was incomplete. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 60.) Plaintiff and Cost discussed having another meeting in an August 24, 2012 e-mail. (*Id.*) Before the meeting occurred, however, Plaintiff filed this lawsuit on August 30, 2012. (*Id.*) Plaintiff did not inform Cost of the filing of the lawsuit prior to or during the meeting. (*Id.*) Upon learning about the lawsuit after their meeting, Cost informed Plaintiff on September 4,

2012, that further discussions would have to be suspended pending instructions from counsel. (*Id.*)

Section 2.1(c)(v) of the SPA contains an accounting dispute resolution provision (the "ADR Provision") which provides that in the event of a disagreement over the Revenues and EBITDA for the Earn-Out calculation, as shown in the Applicable Financials, the parties would engage in certain efforts to resolve the disagreement. (R. 146, Def.'s Rule 56.1 Resp. ¶ 45.) "If any objection cannot be resolved, the Shareholder Representative and [Brightstar] shall each promptly appoint a separate independent accountant . . . to determine the applicable Revenue and/or EBITDA for the Applicable Financials, as applicable." (R. 146, Def.'s Rule 56.1 Resp. ¶ 45; R. 127-8, Ex. W, SPA at 97.) If the parties' independent accountants cannot agree on the correct Earn-Out calculation, then a third independent accountant is appointed to resolve the dispute. (R. 127-8, Ex. W, SPA at 97.) In summer 2012, Plaintiff shared many if not all of OTBT's financial documents that he received from Izotov with his accountants, Ron Hornsey and William Polash. (R. 170, Pl.'s Resp. Add'l Facts ¶ 11.) Plaintiff never informed Brightstar that he was retaining an accounting firm to review these confidential documents, nor did Plaintiff obtain Brightstar's permission to do so. (*Id.*) Plaintiff testified that according to his accountant, the Earn-Out could not be calculated at all because the parties did not agree on what the applicable Revenues were; Plaintiff thus filed the lawsuit. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 61.) Plaintiff then attempted to invoke the ADR Provision of the SPA in a February 8, 2013 letter to Brightstar's counsel; in the letter Plaintiff suggested that a number of issues purportedly not raised in the original lawsuit, all relating to the calculation of EBITDA rather than Revenue, should be resolved under the ADR Provision. (*Id.* ¶ 62.) Brightstar explained in response that while it had been trying to resolve these and other issues informally, Plaintiff "chose to litigate

rather than negotiate," and that "it [made] little sense to waste time and energy negotiating a handful of issues that [could not] lead to a resolution of the Earn-Out issue" given that the parties could not agree on what the Revenues even were. (*Id.*)

## X.     Details Regarding Disputed Revenue Sources

Brightstar tracks its own customers, i.e., the resellers (dealers, retailers, and carriers), and manages its business by the various channels in which its customers operate. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 93.) Brightstar does not track, however, the individual end-users who purchase products from the resellers. (*Id.*) Brightstar provided Plaintiff lists of all the customers to whom Tech Data's subsidiaries sold goods and services during the relevant period, which were reported through BEL and resulted in earnings for Brightstar. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 73.) Neither Brightstar nor Tech Data can identify any of these entities as resellers with primary end customers in the commercial, health care, or government sectors. (*Id.*) Plaintiff's expert, Kenneth Malek, also could not say that any of these entities were resellers with primary end customers in the commercial, health care, or government sectors. (*Id.*) Brightstar is unaware of any sales during the Earn-Out period by any of its Affiliates, other than OTBT, to resellers with primary end customers in the corporate, government, or health care markets. (*Id.* ¶ 75.)

Brightstar also provided Plaintiff a list of its Affiliates' customers in Latin America with revenue broken out by "VAR's" and "Enterprise"; this list recorded a total revenue of $20,835,591.00. (R. 164, Def.'s Resp. Add'l Facts. ¶ 35.) However, Kalinoski testified that the revenues recorded on this list were sales of two-way radios and related infrastructure. (*Id.*)

Shareholder Kriete testified that his only firsthand knowledge of what he alleges to be a breach of the Earn-Out Provision was an instance where a contact at Best Buy "intimated" to him

23

that Best Buy was "running their Best Buy For Business business through Brightstar directly."

(R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 77.) Kriete also testified that as to Europe, he was "pretty

confident that there was probably some sell through of the products to those markets in some

areas." (*Id.*) Plaintiff testified that his basis for believing that BEL had revenues that should

have counted toward the Earn-Out was the profits Brightstar received from its sale of its share of

BEL to Tech Data, which were recorded in Brightstar's June 27, 2011 S-1 statement. (*Id.* ¶ 78.)

Plaintiff assumed that OTBT should have been credited for 75% of BEL's reported revenues, a

number he indicated he "pulled [] out of the air." (*Id.*) Shareholder Chase testified that it was

his opinion that "betwixt [Brightstar and Tech Data], they definitely sold, distributed products

that qualified under [the SPA]." (*Id.* ¶ 79.) Chase admitted, however, that none of these alleged

sales outside of the United States occurred using any asset of OTBT. (*Id.*) Similarly to Kriete,

Chase testified that the only example of a qualifying sale that OTBT was not credited for, which

he could cite to, was an alleged relationship between Brightstar and Best Buy for Business;

however, Chase was uncertain as to any details of Brightstar's relationship with Best Buy for

Business. (*Id.*)

Plaintiff's expert Malek testified that all he could opine was that OTBT's revenues during

the Earn-Out period were in excess of $19.675 million, but he could not provide any additional

specificity. (*Id.* ¶ 80.) Malek agreed that the extra revenues "were being pursued [by Brightstar]

independent of OTBT's platform, software, activation capabilities, billing management

capabilities." (*Id.*) Malek believed that some portion of Brightstar's sales to Best Buy were

relevant to the Earn-Out, to the extent that "some portion of those customers are believed to be

business end users." (R. 171, Sealed Pl.'s Resp. to Add'l Facts ¶ 2.) However, Malek did not

make any determination of the dollar value of such revenues, and he could not say who Best

Buy's "primary end customers" were. (*Id.*) Malek could not identity a single "Relevant Reseller" to whom a Brightstar Affiliate sold products or services during the Earn-Out period. (*Id.* ¶ 3.)

## XI. Sale of Brightstar's Remaining Interest in OTBT to Tech Data

On August 15, 2013, Brightstar executed a second stock purchase agreement with Tech Data whereby it sold its remaining interest in OTBT to Tech Data. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 95.) Tech Data purchased Brightstar's ownership for a total price of $2,661,000.00; $554,000.00 of that total purchase price represented "the currently accrued [Earn-Out] payable to [OTBT's] prior shareholders," which Brightstar was responsible for. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 98.) According to Brightstar, the $554,000.00 amount represented an estimated liability and did not represent what Brightstar believed was actually owed. (*Id.*)

## XII. Plaintiff's Employment at MNJ

Plaintiff at all relevant times was head of sales for MNJ Technologies Direct, Inc. ("MNJ"), a fill service technology reseller focused on servicing the needs of enterprise business, government agencies, and educational institutions. (R. 170, Pl.'s Resp. Add'l Facts ¶ 9.) In early 2013, Plaintiff communicated with individuals of GTSI Corp. ("GTSI"), including a GTSI representative for Department of Defense sales. (R. 171, Sealed Pl.'s Resp. Add'l Facts ¶ 10.) MNJ and GTSI at that time were discussing GTSI using MNJ as a vendor. (*Id.*)

## XIII. Indemnification Provision

The SPA includes an Indemnification Provision in Section 7.4 that states:

Each of the Shareholders, jointly and severally, and [Brightstar] (the indemnifying party being hereinafter referred to as the "**Indemnitor**") agree to defend . . . indemnify, pay and hold harmless the other party and the officers, directors, employees, agents, heirs, trustees, successors, assigns, and Affiliates of the other party (collectively called the "**Indemnitees**"), from and against any and all Indemnified Liabilities (as hereinafter defined) . . . .

As used herein, "**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages . . . penalties, actions, judgments, suits, claims . . . costs . . . expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceedings commenced or threated by any Person, . . . whether direct or indirect, whether or not involving a third party claim, and whether based on any federal, state or foreign laws, statutes, rules or regulations . . . on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement, the other Purchase Documents or the transactions contemplated hereby or thereby . . . .

(R. 146, Def.'s Rule 56.1 Resp. ¶ 46; R. 127-8, Ex. W, SPA, at 183.)

## PROCEDURAL HISTORY

Plaintiff initiated this action on August 30, 2012, by filing a one-count complaint. (R. 1, Compl.) In his complaint, Plaintiff alleges that Brightstar breached the SPA by failing to route all sales of the agreed upon products and services through OTBT, which would have resulted in Revenue for OTBT, and instead selling the relevant products and services through other affiliated entities. (*Id.* ¶¶ 9, 38.) On December 12, 2013, Brightstar filed a motion to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 11, Def.'s Mot to Dismiss.) This Court denied Brightstar's motion to dismiss on September 4, 2013, finding the language in Section 2.1(c)(i) of the SPA ambiguous and susceptible to both parties' interpretations. (R. 23, Mem. Op. & Order.) The Court additionally granted Plaintiff's motion for leave to file a supplemental complaint. (*Id.*) In his supplemental complaint, Plaintiff alleges that Brightstar further breached its obligations under the SPA, including its implied obligations of good faith and fair dealing, by: (1) miscalculating the EBITDA; and (2) refusing to participate in the ADR process. (R. 18-1, Supp. Compl. ¶¶ 3, 15-16, 22.)

On September 24, 2013, Brightstar answered both the complaint and supplemental complaint and also raised affirmative defenses. (R. 24, Answer to Compl.; R. 25, Answer to Supp. Compl.) Plaintiff responded to Brightstar's affirmative defenses on October 15, 2013. (R. 30, Pl.'s Resp. to Affirmative Defenses.) On August 18, 2014, Brightstar moved to amend its answer and add the affirmative defense of failure of consideration as to the Second Amendment to the SPA, (R. 95, Def.'s Mot. to Amend), which the Court granted on October 10, 2014, (R. 138, Mem. Op. & Order).

On September 22, 2014, Brightstar moved for partial summary judgment, (R. 117, Def.'s Mot. Summ. J.), and Plaintiff moved for summary judgment, (R. 124, Pl.'s Mot. Summ. J.). On October 24, 2014, both parties responded to the others' motion for summary judgment, (R. 145, Def.'s Resp.; R. 149, Pl.'s Resp.), and on November 7, 2014, both parties replied, (R. 163, Def.'s Reply; R. 172-1, Pl.'s Reply). Additionally, on October 24, 2014, Plaintiff moved to strike certain paragraphs of Brightstar's Local Rule 56.1 statement of facts, (R. 156, Pl.'s Mot. to Strike Facts), and on November 7, 2014, moved to strike certain responses in Brightstar's response to his statement of facts, (R. 174, Pl.'s Mot. to Strike Resp.). On November 25, 2014, the Court denied Plaintiff's motion to strike certain paragraphs of Brightstar's statement of facts and ordered Plaintiff to respond to the remaining paragraphs. (R. 184, Order.) Plaintiff responded to the remaining paragraphs on December 5, 2014. (R. 191, Pl.'s Add'l Rule 56.1 Resp.)

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under

governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Id.* at 255; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("[D]istrict courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record."). The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

Once the moving party has met this burden, the nonmoving party must "come forward with specific facts demonstrating that there is a genuine issue for trial." *Wheeler*, 539 F.3d at 634. "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for the plaintiff." *Id.* (citing *Anderson*, 477 U.S. at 251-52.) The nonmoving party may not rely on "mere conclusions and allegations" to create a genuinely disputed issue of material fact. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, the nonmoving party "must make a showing sufficient to establish any essential element of her cause of action for which she will bear the burden of persuasion at trial." *Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 425 (7th Cir. 1997); *see*

*also Celotex*, 477 U.S. at 322-23. Weighing evidence and making credibility decisions are jury functions, and it is not appropriate for a judge to assume those functions when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255.

On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (referring to Local Rules 12(M) and (N), which were replaced by Local Rule 56). To adequately dispute a statement of fact, the opposing party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).

# ANALYSIS

## I. Whether Brightstar Breached the Representation and Warranty in Section 2.1(c)(i) of the SPA[3]

In his complaint, Plaintiff alleges that Brightstar breached the Representation and Warranty in the Earn-Out Provision in Section 2.1(c)(i) of the SPA by selling relevant products and services, which should have resulted in Revenue for OTBT, through affiliated entities other than OTBT.[4] (R. 1 Compl. ¶ 38.) The Representation and Warranty provides that "neither [Brightstar] nor any of its Affiliates (except [OTBT]) will directly or indirectly sell any products or services which would generate Revenue." (R. 151, Pl.'s Rule 56.1 Resp. ¶ 25.) Revenue is defined immediately prior to the Representation and Warranty as follows: "The Earn-Out shall be linked to tiered milestones of [OTBT's] GAAP-reported revenue ("**Revenues**") and EBITDA derived from any and all sales including, but not limited to, [Relevant Products] derived through the following channels: [Relevant Channels] with [Relevant End-Users] . . . ." (*Id.*)

---

[3] In his complaint, Plaintiff also alleges that Brightstar breached Section 2.1(c)(i) by failing to route all sales of relevant products and services through OTBT. (R. 1, Compl. ¶ 9.) Brightstar argues that the SPA did not require it to route the sales from its global business through OTBT. (R. 119, Def.'s Mem. at 15-16.) Plaintiff does not respond to Brightstar's arguments on this issue. Instead, Plaintiff ignores this particular claim and asserts that the term "route" is "not necessary to [his] claim" that Brightstar violated the Representation and Warranty by selling competitively with OTBT. (R. 150, Sealed Pl.'s Resp. at 19-20.) Additionally, Plaintiff does not address this claim in his own motion for summary judgment. The Court thus finds that Plaintiff has waived his claim that Brightstar breached the SPA by failing to route all sales of relevant products through OTBT. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming the plaintiff's negligence claim abandoned because he failed to delineate it in his brief in opposition to summary judgment); *Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the district court in response to summary judgment motions are waived); *YCB Int'l, Inc. v. UCF Trading Co. Ltd.*, 904 F. Supp. 2d 870, 879 (N.D. Ill. 2012) (finding that the plaintiff's failure to defend a particular claim in response to the defendant's motion for summary judgment constituted abandonment of the claim).

[4] As explained in this Court's September 4, 2013 Memorandum Opinion and Order, Florida law governs Plaintiff's breach of contract claim. (R. 23, Mem. Op. & Order at 6-7.)

The parties have different interpretations of the definition of Revenue. Brightstar argues that the SPA defines the term "Revenues" as OTBT's "GAAP-reported revenue," and thus the Representation and Warranty "bars Brightstar only from diverting the sale of OTBT's products or services to any Brightstar entity other than OTBT, which would have the effect of reducing OTBT 'Revenue' and thus the Earn-Out." (R. 119, Def.'s Mem. at 17.) Brightstar contends that the language of the SPA does not prohibit Brightstar from continuing to do business by selling its own products to its own customers around the world, independent of OTBT. (*Id.*) Plaintiff argues that Brightstar's interpretation of the term Revenue would render the Representation and Warranty "illusory." (R. 150, Sealed Pl.'s Resp. at 21.) Plaintiff contends that the definition of Revenue "includes the sale of Relevant Products through Relevant Channels to Relevant End-Users and that Brightstar agreed not to engage in Relevant Sales during the Earn-Out Period" other than through OTBT. (R. 126, Sealed Pl.'s Mem. at 12.) At the motion to dismiss stage, this Court found the language in Section 2.1(c)(i) ambiguous and susceptible to both parties' interpretations. (R. 23, Mem. Op. & Order at 8-11.) Both parties now argue that extrinsic evidence supports their interpretation of the term Revenue. (R. 119, Def.'s Mem. at 19-21; R. 126, Sealed Pl.'s Mem. at 12-15); *see PartyLite, Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1233 (M.D. Fla. 2012) ("Under Florida law, extrinsic evidence is admissible regarding the intent of parties to a contract if a latent ambiguity exists." (collecting cases)); *Strama v. Union Fidelity Life Ins. Co.*, 793 So.2d 1129, 1132 (Fla. Dist. Ct. App. 2001). The Court need not resolve this ambiguity, however, because it can decide whether Brightstar breached the Representation and Warranty using Plaintiff's expansive interpretation.

Brightstar argues that even assuming Plaintiff's expansive interpretation of Revenue is correct, Plaintiff has failed to meet his burden of providing sufficient evidence to support his

claim that Brightstar actually breached the Representation and Warranty. (R. 119, Def.'s Mem. at 12-20.) Specifically, Brightstar argues that Plaintiff has produced no evidence that Brightstar or its other Affiliates engaged in sales of Relevant Products to Relevant Resellers, i.e., those with primary end customers in the commercial, health care, and government markets. (*Id.*) Plaintiff argues that the evidence shows that: (1) BEL engaged in sales of Relevant Products to Relevant Resellers; and (2) Brightstar sold Relevant Products to Relevant Resellers through its enterprise division and through Brightstar U.S. (R. 126, Sealed Pl.'s Mem. at 19-24.) Plaintiff contends that the revenue from these Relevant Sales should be added to OTBT's Revenue, thereby entitling Shareholders to the maximum Earn-Out cap of $5 million.[5]

---

[5] Brightstar's June 27, 2012 Earn-Out calculation indicates that OTBT generated $16,867,000.00 in Revenue. (R. 126, Pl.'s Mem. at 19.) According to Plaintiff, the top revenue tier in the chart in Section 2.1(c)(iii) of the SPA is $19,675,000.00, and thus less than $3 million in Revenue is required to hit the top tier. (*Id.*) At the top tier, Shareholders are entitled to an Earn-Out equal to OTBT's EBITDA capped at $5 million. (*Id.*) Plaintiff argues that if BEL's and Brightstar's other Affiliates' Relevant Sales are added to OTBT's Revenue, the Revenue amount will hit the top tier. (*Id.* at 20.) The top revenue tier is $19,675,000.00, however, only if the Second Amendment to the SPA applies and the Quartering Provision was triggered. The Court addresses whether the Second Amendment and the Quartering Provision apply later in this opinion.

## A.    Whether BEL engaged in Relevant Sales[6]

Plaintiff relies on Brightstar's June 27, 2011 S-1 statement filed with the SEC to support

his argument that BEL engaged in Relevant Sales during the Earn-Out period. (R. 150, Sealed

Pl.'s Resp. at 26-27.) This SEC filing, filed two months into the Earn-Out period, states that

BEL's "core services in the region include value-added distribution, government and VARs, and

consumer services." (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 69.) Additionally, it states that:

> [BEL] serves device manufacturers, operators and retailers in 15 countries, providing value-added distribution, supply chain, retail, government and VARS and consumer services. . . . In addition . . . [BEL] recently launched enterprise services in Europe that enable VARS to sell wireless devices to small and medium businesses and consumers. . . . The services that [BEL] provides to VARS include (i) operator management services; (ii) channel and merchandising services; and (iii) back office administration services.

(R. 164, Def.'s Resp. Add'l Facts ¶ 38.) Brightstar argues that "this high-level, general

description of BEL's business is not evidence that BEL generated revenue from any sale of a

Relevant Product to a Relevant Reseller during the Earn-Out Period"; in Brightstar's view, it is

simply a description of the various market segments BEL attempted to serve. (R. 119, Def.'s

Mem. at 25.) Claure, Brightstar's CEO and Chairman of BEL's board of directors, testified that

in excess of 99% of BEL's revenue came from sales of mobility and IT products to the

retail/telecom channel, i.e., mobile carriers, retailers, and dealers, not the IT/VAR channel that

---

[6] Brightstar argues that BEL's revenues are not relevant to the Earn-Out calculation for two reasons: (1) BEL does not qualify as an Affiliate under the SPA; and (2) BEL had no Relevant Sales. (R. 119, Def.'s Mem. at 23-27.) Brightstar argues that BEL is not an Affiliate as defined by the SPA, and therefore not subject to the Representation and Warranty, because Brightstar had no operational control of BEL, and Brightstar did not have the power to vote securities for the election of BEL's directors. (*Id.* at 26-27.) Plaintiff argues that BEL is an Affiliate because BEL's Shareholder Agreement and Brightstar's SEC filings prove that Brightstar jointly controlled BEL. (R. 150, Sealed Pl.'s Resp. at 25.) The Court need not decide whether BEL is an Affiliate under the SPA, however, because it can make its ruling based on Brightstar's second argument, which is that even assuming BEL qualifies as an Affiliate, BEL did not engage in Relevant Sales. (R. 119, Def.'s Mem. at 23-26.)

includes Relevant Resellers. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 69.) Corey, president of Brightstar's enterprise group, also testified that BEL's sales to IT channel VARs primarily with business customers, if any, were immaterial and negligible. (*Id.*) This testimony is corroborated by a number of financial news items where Tech Data executives indicated that BEL distributed mobility products in the retail channel. (*Id.* ¶ 90.)

All of BEL's revenue was generated by sales made by Tech Data's subsidiaries across Europe. (*Id.* ¶ 64.) Tech Data produced lists of every reseller to whom its subsidiaries made sales to, which were reported through BEL, during the Earn-Out period. (*Id.* ¶ 73; R. 121-6, Ex. 49, Sales in Austria at 2-18; R. 121-6, Ex. 50, Sales in Belgium at 20-43; R. 121-7, Ex. 51, Sales in the Netherlands at 2-23; R. 121-11, Ex. 70, Sales in Europe at 27-36.) These lists reflect a total revenue of $1,688,494,827.46 from sales of mobility-related products. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 90.) Brightstar contends that neither it nor Tech Data can identify any of these resellers as Relevant Resellers. (R. 192, Pl.'s Add'l Rule 56.1 Resp. ¶ 73.) Additionally, Brightstar produced BEL's monthly reports reflecting its revenues and EBITDA during the Earn-Out period. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 88; R. 130-1, Ex. FF, BEL's Monthly Reports.) Plaintiff argues that the lists of resellers and the monthly reports prove that BEL made Relevant Sales totaling $1,688,494,827.46, which should count towards OTBT's Revenue. (R. 126, Sealed Pl.'s Mem. at 22.) Plaintiff fails to identify, however, which of the thousands of resellers listed qualify as Relevant Resellers operating in the IT/VAR channel with primary end customers in the commercial, health care, or government sectors. Plaintiff also fails to explain where in BEL's monthly reports (which make up a 100 plus page exhibit) it indicates that BEL made sales to Relevant Resellers in the Relevant Channels. In response to Brightstar's statement of facts, Plaintiff simply states that the reseller lists and monthly reports identify

VARs, but he gives no further explanation of who exactly the VARs are. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 73.) It is not the task of this Court to comb through hundreds of pages of documents and attempt to identify which, if any, of the thousands of resellers are VARs operating in the IT channel. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702 (7th Cir. 2010) ("As we have repeated time and again, 'Judges are not like pigs, hunting for truffles buried in the record.'"); *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) (The court "will not root through the hundreds of documents and thousands of pages that make up the record here to make [plaintiff's] case for him."). Indeed, if Plaintiff's own expert could not identify any of the resellers listed as resellers with primary end customers in the commercial, health care, or government sectors, (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 73), the Court certainly should not be expected to do so. Plaintiff is asking this Court to accept as true his assertion that BEL sold to VARs without providing the Court with any concrete evidence to support this allegation, but "saying so doesn't make it so." *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010). Plaintiff may not rely on "mere speculation or conjecture" to create a genuinely disputed issue of material fact. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). The Court thus finds that Plaintiff has not provided sufficient evidence on which a jury could reasonably find that BEL made Relevant Sales during the Earn-Out period.

**B.** **Whether Brightstar or its other Affiliates engaged in Relevant Sales**

Plaintiff next argues that Brightstar was actively pursuing enterprise sales in Latin America and elsewhere around the globe and engaging in Relevant Sales. (R. 126, Sealed Pl.'s Mem. at 23-24.) The Court finds none of the evidence Plaintiff offers in support of his argument compelling. Once again, Plaintiff points to Brightstar's June 27, 2011 SEC filing to support his

argument. (*Id.* at 23.) In the "Overview" section of this SEC filing it states that Brightstar is "a leading global services company focused on serving the key participants in the wireless device industry: manufactures, operators, retailers and enterprises. [Brightstar's] principal service is value-added distribution, but [it] also provide[s] supply chain optimization services, retail services, government and value-added resellers (VARs) services and consumer services." (R. 146, Def.'s Rule 56.1 Resp. ¶ 6.) However, as Brightstar explained, the language in the SEC filing regarding government and VARs services refers to the services Brightstar offered through OTBT. (R. 143, Sealed Def.'s Resp. at 29.)

Plaintiff also relies on a power point attached to a December 2010 e-mail from Corey, president of Brightstar's enterprise group, to prove that Brightstar was engaging in Relevant Sales in Latin America and Turkey. (R. 126, Sealed Pl.'s Mem. at 23.) However, the power-point slide that Plaintiff cites is entitled "General Business Update" and it simply mentions enterprise business in Latin America and Turkey. (R. 165, Sealed Def.'s Reply at 18; R. 128-1, Ex. Z, Power Point at 258.) Further, this slide was made in December 2010, well before the Earn-Out period. Brightstar contends that this evidence merely reflects Brightstar's attempts and hopes to capture enterprise sales in the enterprise channel outside the United States before the Earn-Out period. (R. 165, Sealed Def.'s Reply at 17.)

Additionally, Plaintiff offers a list of customers of Brightstar's Affiliates in Latin America with revenue totals broken out by "VAR's" and "Enterprise" as further support for his argument. (R. 150, Sealed Pl.'s Resp. at 28; R. 154, Ex. KKK, Customer List at 133-34.) First, there is no date on this list and so the Court has no way to verify that these sales were made during the Earn-Out period. Second, Kalinoski testified that the revenues recorded on this list were not from sales of Relevant Products to Relevant Resellers, but rather were from sales of

two-way radios and related infrastructure. (R. 165, Def.'s Reply at 18; R. 166, Def.'s Resp. Add'l Facts ¶ 35.) Plaintiff has offered no other evidence to prove that Brightstar's other Affiliates engaged in Relevant Sales in Latin America or elsewhere during the Earn-Out period.

Lastly, Plaintiff argues that Brightstar made Relevant Sales to Best Buy during the Earn-Out period and that a portion of those sales should be counted toward OTBT's Revenue. (R. 126, Sealed Pl.'s Mem. at 24.) However, Best Buy is one of Brightstar's largest retail customers and therefore is not a Relevant Reseller. (R. 191, Pl.'s Add'l Rule 56.1 Resp. ¶ 76.) Best Buy for Business is the enterprise-focused group within Best Buy that caters to commercial end users, and Brightstar is not a fulfillment partner for Best Buy for Business. (*Id.*) The sales that were made directly to Best Buy for Business were made by OTBT. (*Id.*)

As the Court explained above, Plaintiff's conclusory assertions that Brightstar and its Affiliates made Relevant Sales are not sufficient to establish a genuine issue of material fact. Plaintiff has failed to specifically identify "a single customer, sale, or dollar of revenue" that he contends qualifies as a Relevant Sale. (R. 165, Sealed Def.'s Reply at 18.) The Court thus finds that Plaintiff has not provided sufficient evidence on which a jury could reasonably find that Brightstar or any of its Affiliates other than OTBT made Relevant Sales during the Earn-Out period.

Seeking to avoid this result, Plaintiff presents an alternative argument. Plaintiff notes that Brightstar does not track the end users of its customers and thus is unable to prove whether any of its customers has end users that are primarily commercial, government, or health care industries. (R. 126, Sealed Pl.'s Mem. at 17.) Relying on the theory of equitable estoppel, Plaintiff thus argues that "Brightstar should be estopped from claiming that it complied with the Representation and Warranty since Brightstar, by its own admission, could not fulfill the

Representation and Warranty." (*Id.* at 19.) Plaintiff later clarifies his argument, claiming that he is only seeking to use equitable estoppel "to bar Brightstar from arguing its legal conclusion that none of its sales to retail customers are Relevant Sales." (R. 172-1, Pl.'s Reply at 11.)

Equitable estoppel is a defensive doctrine which prevents a party from asserting a claim or a defense, such as statute of limitations, which arises solely because of the party's own misconduct. *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1076-77 (Fla. 2011). Equitable estoppel requires a party to make a misrepresentation to the opposing party, which the opposing party relies on to his detriment. *Flagship Resort Dev. Corp. v. Interval Int'l, Inc.*, 28 So. 3d 915, 923 (Fla. Dist. Ct. App. 2010). Here, Plaintiff has failed to show how it detrimentally relied on any misrepresentation by Brightstar. Thus, the Court finds the theory of equitable estoppel inapplicable to the facts of this case.

In any event, Plaintiff's argument that Brightstar should not be allowed to argue that sales to its retail customers are irrelevant because it does not know who the end users are is unconvincing and misguided. Plaintiff is correct that Brightstar does not track its products after it sells them to its customers, i.e., resellers, and thus Brightstar does not know who the specific end users of its products are. (R. 143, Sealed Def.'s Resp. at 12.) The Court agrees with Brightstar, however, that information on actual end users is irrelevant. (*Id.*) Under the SPA, for a sale to qualify as a Relevant Sale, it must be made by a reseller, operating in the Relevant Channels, "with primary end customers" in the commercial, health care, and government markets. (*Id.*; R. 151, Pl.'s Rule 56.1 Resp. ¶ 25.) Brightstar knows who its customers are and in what channels those customers operate, and that is all that the SPA requires. (R. 143, Sealed Def.'s Resp. at 12.) Plaintiff argues that Brightstar's retail customers are not automatically irrelevant because they could potentially have primary end customers in the commercial, health

care, and government markets. (R. 172-1, Pl.'s Reply at 12.) This argument is illogical,

however, because the parties agree that retailers are resellers that operate in the retail/telecom

channel, and therefore their primary end customers are consumers and not customers in the

commercial, health care, and government markets. (R. 151, Pl.'s Rule 56.1 Resp. ¶¶ 2, 4, 7.)

Therefore, sales to Brightstar's retail customers do not qualify as Relevant Sales.

Accordingly, the Court finds that Plaintiff has not provided sufficient evidence on which

a jury could reasonably find that Brightstar breached the Representation and Warranty by

engaging in Relevant Sales through Affiliates other than OTBT. Therefore, the Court grants

summary judgment in favor of Brightstar on this claim.

## II.     Whether the Quartering Provision Applies

The Quartering Provision provides:

> [Brightstar] further acknowledges and agrees that if it does not enter into a joint
> venture or similar relationship with one of the JV Partners (the "JV Relationship")
> on or prior to March 31, 2011 . . . the Earn-Out table set forth in Section 2.1(c)(iii)
> above shall be modified by dividing each of the Revenue Thresholds set forth in
> Column A by four (4) and leaving the corresponding EBITDA Cap set forth
> opposite such Revenue Threshold as is.

(R. 151, Pl's Rule 56.1 Resp. ¶ 32.) The Quartering Provision thus makes the revenue thresholds

easier to attain, which consequently affects the maximum Earn-Out Shareholders could receive.

Brightstar argues that the JV between itself and Tech Data involving OTBT was "entered into"

before March 31, 2011, and therefore the Quartering Provision does not apply. (R. 119, Def.'s

Mem. at 30-33.) In support of this argument, Brightstar asserts that: (1) two of the key joint

venture contractual documents—the JV Shareholders' Agreement and the JV SPA—were signed

no later than March 28, 2011; and (2) Brightstar and Tech Data agreed to proceed with the JV in

October 2010 and formed a steering committee which met regularly until the full operation was

up and running. (*Id.* at 31-32.) According to Brightstar, this evidence is sufficient to prove

under Florida law that a joint venture existed no later than March 28, 2011. (*Id.* at 32 (citing *Fla. Trading & Inv. Co., Inc. v. River Constr. Servs., Inc.*, 537 So. 2d 600 (Fla. Dist. Ct. App. 1988)).)

Plaintiff argues that the JV was not "entered into" until April 29, 2011, when the deal closed. (R. 150, Sealed Pl.'s Resp. at 10.) Plaintiff contends that e-mail correspondence between Brightstar employees prove that the closing was the essential act before the JV was considered "entered into." (*Id.* at 10-11.) Additionally, Plaintiff asserts that the JV Shareholders' Agreement between Brightstar, Tech Data, and OTBT, which set forth the terms relating to the operation of OTBT, became effective on April 29, 2011. (*Id.* at 11.)

Under Florida law, a joint venture "is created when two or more persons combine their property or time or a combination thereof in conducting some particular line of trade or for some particular business deal." *Jackson-Shaw Co. v. Jacksonville Aviation Auth.*, 8 So. 3d 1076, 1089 (Fla. 2008) (quoting *Kislak v. Kreedian*, 95 So. 2d 510, 515 (Fla. 1957)). The relationship must arise out of a contract, which may be expressed or implied. *Kislak*, 95 So. 2d at 515. In order to establish a joint venture, a contract must contain the following elements: "(1) a community of interest in the performance of the common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits and (5) a duty to share in any losses which may be sustained." *Jackson-Shaw Co.*, 8 So. 3d at 1089 (quoting *Kislak*, 95 So. 2d at 515). "The absence of one of the elements precludes a finding of a joint venture." *Id.*

Here, the dispute is not over whether or not a joint venture ever existed, but rather at what point in time the joint venture was formed. (R. 150, Sealed Pl.'s Resp. at 10.) Most of the cases Brightstar cites in support of its argument deal with the question of whether a joint venture relationship existed between the parties; none answer the specific question at issue here. Neither

party has provided the Court with any cases to assist in resolving this issue, and the Court was unable to find any cases involving similar facts to the instant case. However, the Court finds the Florida Supreme Court's decision in *Jackson-Shaw Company* instructive. *Jackson-Shaw Company* makes clear that a joint venture exists when two or more persons combine their property or time. 8 So. 3d at 1089. Here, this did not occur until the closing of the JV on April 29, 2011. The JV SPA explicitly states that the agreement was executed on March 23, 2011, but was not effective until the closing date on April 29, 2011. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶ 59; R. 121-1, Ex. 53, JV SPA, at 29.) Tech Data did not give Brightstar money in exchange for shares of OTBT's stock until the closing date. (R. 121-1, Ex. 53, JV SPA, at 29-30.) Additionally, Florida case law establishes that joint control or right of control is an essential element in the formation of a joint venture, *Jackson-Shaw Co.*, 8 So. 3d at 1089, and Tech Data did not have joint control of OTBT until it received the shares of stock from Brightstar on April 29. So while Brightstar and Tech Data had an agreement to form a joint venture before March 31, 2011, that joint venture was not formed, hence was not "entered into," until afterward when shares were transferred and both Tech Data and Brightstar began running OTBT.

Lastly, Brightstar argues that the SPA requires "a joint venture or similar relationship," and so the closing date should not be important because Brightstar and Tech Data could have entered into a "similar relationship" which might not have had a "closing." (R. 165, Sealed Def.'s Reply at 8.) The Court finds this argument unconvincing because Brightstar and Tech Data did not in fact enter into a "similar relationship"; they entered into a joint venture, rendering the "similar relationship" language irrelevant. Accordingly, the Court finds that the revenue thresholds should be quartered, and therefore denies Brightstar summary judgment on this issue.

## III.  Whether the Second Amendment is Valid

The Second Amendment to the SPA reduced the revenue thresholds set forth in Section 2.1(c)(iii) by more than 20%, without reducing the corresponding EBITDA (or Earn-Out) caps. (R. 151, Pl.'s Rule 56.1 Resp. ¶ 40.)  Brightstar proposed and drafted the Second Amendment because it learned that Tech Data would not be routing its laptop sales through the OTBT joint venture, as was originally expected, and so the reduced revenue thresholds were designed to make up for this loss of revenue. (R. 119, Def.'s Mem. at 33.)  However, Plaintiff claims that the SPA requires that OTBT get credit for sales of Tech Data's laptops that were activated by OTBT, and that the Second Amendment does not exclude laptop sales from the Earn-Out. (R. 150, Sealed Pl.'s Resp. at 15-16.)  Brightstar thus argues that Plaintiff gave no consideration for the Second Amendment, and it is therefore invalid. (R. 119, Def.'s Mem. at 34.)  Specifically, Brightstar argues that the Second Amendment is invalid for want of consideration and failure of consideration. (R. 165, Sealed Def.'s Reply at 13-14.)  Plaintiff argues that the Second Amendment was supported by consideration because Brightstar did not account for Tech Data's laptop sales in the Earn-Out calculation. (R. 150, Sealed Pl.'s Resp. at 14.)

Under Florida law, an amendment to a contract must be supported by new consideration. *Schneir v. State*, 43 So. 3d 135, 137 (Fla. Dist. Ct. App. 2010).  Consideration "may consist of either a benefit to the promisor or a detriment to the promisee." *Real Estate World Fla. Commercial, Inc. v. Piemat, Inc.*, 920 So. 2d 704, 706 (Fla. Dist. Ct. App. 2006); *see also Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1311 (11th Cir. 1998) ("[E]ach party must promise to do something which will yield a benefit or advantage to the other, or which will result in a detriment or disadvantage to himself in exchange for the other promise.").  A promise can constitute sufficient consideration so long as a party agrees to do

something that he is not already bound to do. *Crystal Colony Condominium Ass'n v. Aspen Specialty Ins. Co.*, 6 F. Supp. 3d 1295, 1299 (S.D. Fla. 2014) (quoting *Ashby v. Ashby*, 651 So. 2d 246, 247 (Fla. Dist. Ct. App. 1995)). However, if "one of the promises appears on its face to be so insubstantial as to impose no obligation at all on the promisor—who says, in effect, I will if I want to—then that promise may be characterized as an illusory promise, i.e., a promise in form but not in substance." *Johnson Enterprises*, 162 F.3d at 1311 (citation and internal quotation marks omitted) (applying Florida law). An illusory promise does not constitute sufficient consideration. *Id.*; *see also Rosenberg v. Lawrence*, 541 So. 2d 1204, 1206 (Fla. Dist. Ct. App. 1988) ("Where one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound.").

Brightstar argues that the Second Amendment is facially invalid for want of consideration. (R. 143, Sealed Def.'s Resp. at 25.) Brightstar contends that it "had understood the consideration for the modified thresholds to be Plaintiffs' acknowledgement and acceptance of the exclusion of Tech Data's laptops from OTBT's revenue sources," but now knows that its understanding was incorrect. (R. 165, Sealed Def.'s Reply at 13.) There is nothing in the record that proves that Plaintiff promised to acknowledge and accept the exclusion of Tech Data's laptop sales from OTBT's Revenue. Plaintiff asserts that on its face, the Second Amendment made only one change to the SPA: it reduced the revenue thresholds from the original version. (R. 146, Def.'s Rule 56.1 Resp. ¶ 57.) Plaintiff has consistently insisted throughout this litigation that it is "undisputed that the Second Amendment does not exclude Laptop Sales from the Earn-Out." (R. 150, Sealed Pl.'s Resp. at 16.) In his deposition, Plaintiff acknowledged that while it "sounds feasible" that the Second Amendment was executed because laptop sales were going to be excluded from OTBT's Revenue, that is "not what [the Second Amendment] says . . .

it's not [in] there." (R. 151, Pl.'s Rule 56.1 Resp. ¶ 41; R. 119, Def.'s Mem. at 35.) Plaintiff refused to acknowledge anything Brightstar received in exchange for reducing the revenue thresholds, and simply stated, "Thank you, Brightstar, I guess. . . . I can't be responsible if [Brightstar's] people can't pay attention to detail." (R. 151, Pl.'s Rule 56.1 Resp. ¶ 41.) Shareholders Kriete and Chase also could not identify anything Brightstar received in exchange for reducing the revenue thresholds. (*Id.*) The Shareholders' stark denial of any benefit to Brightstar clearly suggests that the Shareholders never intended to give any consideration in exchange for the Second Amendment. Thus, if Plaintiff did make a promise to acknowledge and accept the exclusion of Tech Data's laptop sales, as was understood by Brightstar at the time the Second Amendment was executed, the evidence is clear that Plaintiff did not intend to be bound by the promise, in effect saying, "I will if I want to." *See Johnson Enterprises*, 162 F.3d at 1311. Accordingly, Plaintiff's promise, if in fact made, was an illusory promise and therefore not sufficient consideration to support the Second Amendment.

Plaintiff argues that Brightstar received consideration for the Second Amendment because Brightstar did not account for Tech Data's laptop sales in OTBT's Revenue. (R. 150, Sealed Pl.'s Resp. at 14.) However, Plaintiff's argument is beside the point. As the Court explained, the Second Amendment is facially invalid because Plaintiff made an illusory promise. Further, even if the Second Amendment were not facially invalid for lack of consideration, the Court agrees with Brightstar that any consideration for the Second Amendment "failed entirely when Plaintiffs made a claim against Brightstar for" Tech Data's laptop revenue. (R. 165, Def.'s Reply at 13 (citing *Narus v. Narus*, 382 So. 2d 144, 146 (Fla. Dist. Ct. App. 1980)).) In *Narus*, the Court held that where the sole consideration for a widow's agreement to relinquish part of her legal entitlement to the marital residence was a promise from the decedent's children not to

seek legal recourse against her, the children's filing of a probate action attempting to deprive the widow of the entire estate "clearly constituted a total failure of consideration." 382 So. 2d at 146. The court explained that as soon as the children filed the lawsuit, "the written agreement became nudum pactum," i.e., an empty promise. *Id.* Here, similar to *Narus*, the sole consideration for Brightstar's agreement to lower the revenue thresholds was Plaintiff's supposed promise not to demand Tech Data's laptop sales be included in OTBT's Revenue; therefore, the filing of this lawsuit constitutes a failure of consideration. Thus, the Court finds that the Second Amendment is invalid for lack of consideration and failure of consideration.

Plaintiff additionally argues that if the Second Amendment is disregarded, Tech Data's laptop sales must then be added to OTBT's Revenue and EBITDA in the Earn-Out calculation. (R. 150, Pl.'s Resp. at 16.) Plaintiff further contends that Brightstar violated the SPA by not accounting for the laptop sales in the Earn-Out. (*Id.*) Brightstar counters that the invalidity of the Second Amendment in no way strengthens the merits of Plaintiff's claims to Tech Data's laptop revenue. (R. 165, Sealed Def.'s Reply at 14.) Brightstar contends that the Second Amendment "was offered in order to avoid a dispute over something Brightstar was never obligated to provide" and that "it was not an admission that Brightstar was liable for Tech Data's decision not to sell laptops through OTBT due to tax implications." (*Id.*)

The SPA provides that the Shareholders are entitled to an Earn-Out based on the revenue and EBITDA related to sales of "all handsets, information technology devices (including laptops, tablets, netbooks, etc.), accessories, activation commission, airtime, and other ancillary service revenue. . . ." (R. 151, Pl.'s Rule 56.1 Resp. ¶ 25; R. 127-8, Ex. W, SPA at 159-60.) According to Plaintiff, the SPA is clear that laptops should be part of OTBT's Revenue calculation for the Earn-Out. (R. 150, Sealed Pl.'s Resp. at 15.) The Court agrees with Brightstar, however, that

the SPA only requires OTBT to be credited with its own (or the JV's) laptop sales, and only precludes Brightstar from selling laptops in competition with OTBT. (R. 165, Sealed Def.'s Reply at 14-15 n.3.) The SPA is silent as to Tech Data's laptop sales. Nor does the SPA require Tech Data to route its own laptop sales through OTBT; indeed, Tech Data is not a party to the SPA. Plaintiff nevertheless asserts that the record proves that the intent of the parties when they entered into the SPA was to include Tech Data's laptop sales in OTBT's Revenue. (R. 150, Pl.'s Sealed Resp. at 15.) However, the relevant language in the SPA regarding laptops is clear, and "[w]here the terms of a contract are clear and unambiguous, the parties' intent must be gleaned from the four corners of the document." *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011). Therefore, the Court will not look to extrinsic evidence in the record to expand the plain meaning of the contract. *O'Brien v. McMahon*, 44 So. 3d 1273, 1277 (Fla. Dist. Ct. App. 2010) ("In construing a contract, the court should consider its plain language and take care not to give the contract any meaning beyond that expressed."). Regardless of what the extrinsic evidence may demonstrate about the parties' intent, the SPA does not require that OTBT get credit for Tech Data's laptop sales made independent of the JV. If one of Tech Data's laptops was activated by OTBT, OTBT is entitled to the activation commission, but not the revenue from the sale of the laptop. (R. 151, Pl's Rule 56.1 Resp. ¶ 38.) The Court thus finds that Brightstar did not breach the SPA by failing to account for Tech Data's laptop sales in the Earn-Out.

Accordingly, as a matter of law, the Second Amendment is invalid, and the original revenue table in Section 2.1(c)(iii) of the SPA controls. The Court therefore grants summary judgment in Brightstar's favor on this issue.

## IV.     Whether Brightstar Breached the SPA by Miscalculating the EBITDA

In his supplemental complaint, Plaintiff alleges that Brightstar breached the SPA by miscalculating the EBITDA. (R. 18-1 Supp. Compl. ¶¶ 15.) The SPA sets forth specific directives for calculating the EBITDA, and Plaintiff argues that Brightstar failed to comply with those directives because it: (1) failed to add-back variable compensation; (2) ignored the industry standard requirement for compensation; and (3) ignored the business operating expense requirement. (R. 126, Sealed Pl.'s Mem. at 25-26.) The Court addresses each of Plaintiff's arguments in turn.

### A.     Whether Brightstar was required to add-back variable compensation

The SPA provides that the calculation for EBITDA shall not include expenses related to "bonuses including, but not limited to, variable compensation, payable to individuals whose compensation is included in the calculation of EBITDA including, but not limited to, former Company executives which, for purposes of this Agreement includes any compensation in excess of accepted base salary industry standards." (R. 146, Pl.'s Rule 56.1 Resp. ¶ 44.) Izotov calculated OTBT's EBITDA, and hence the Earn-Out amount, to be $226,000.00. (R. 144, Sealed Def.'s Rule 56.1 Resp. ¶¶ 72, 83.) When Izotov performed this original calculation, he did not add-back any variable compensation. (R. 146, Def.'s Rule 56.1 Resp. ¶ 75.) Later, at the request of Brightstar's in-house counsel, Izotov calculated the variable compensation amount and came up with a total of $329,000.00. (R. 127-1, Ex. J, Izotov Dep. at 220:03-221:10.) Izotov added that amount of variable compensation to the original Earn-Out and came up with a new Earn-Out amount of $554,000.00. (*Id.*; R. 144, Sealed Def.'s Rule 56.1. Resp. ¶ 85.) Plaintiff argues that the SPA requires that the variable compensation amount of $329,000.00 be added

back into the EBITDA, and that Shareholders are thus entitled to an Earn-Out of at least $554,000.00. (R. 172-1, Sealed Pl.'s Reply at 17.)

Brightstar does not dispute that the amount of variable compensation is $329,000.00. Brightstar simply argues that Izotov did not need to add this amount back into the EBITDA because he knew that it was not in excess of industry standards. (R. 143, Sealed Def.'s Resp. at 30.) According to Brightstar, Plaintiff must prove that the variable compensation paid to OTBT employees was in excess of industry standards for that amount to be added back in, which Plaintiff has failed to do. (*Id.*) Brightstar's interpretation of the SPA, however, is incorrect. The SPA states that "bonuses including, but not limited to, variable compensation . . . which, for purposes of this Agreement includes any compensation in excess of accepted base salary industry standards" need to be added back. (R. 146, Pl.'s Rule 56.1 Resp. ¶ 44; R. 127-8, Ex. W, SPA at 148.) "Compensation in excess of accepted base salary industry standards" thus qualifies as a "bonus" under the SPA, just as "variable compensation" qualifies as a "bonus." In other words, "variable compensation" and "compensation in excess of accepted base salary industry standards" are distinct; "in excess of accepted base salary industry standards" does not modify "variable compensation." Thus, variable compensation does not need to be in excess of industry standards, as Brightstar assumes, to be added back. Therefore, the Court finds that the variable compensation in the amount of $329,000.00 needs to be added back into the EBITDA, and the Court grants summary judgment in favor of Plaintiff on this particular issue.

### B.    Whether Brightstar ignored the industry standard requirement for compensation

As explained above, the SPA requires that compensation paid to OTBT employees "in excess of accepted base salary industry standards" be added back into OTBT's EBITDA. (R. 146, Def.'s Rule 56.1 Resp. ¶ 44.) Plaintiff argues that Brightstar breached the SPA by ignoring

the industry standard requirement. (R. 126, Sealed Pl.'s Mem. at 26.) In support, Plaintiff asserts that Kalinoski, Brightstar's corporate representative, testified that he was not aware of any analysis that was done by Brightstar of the base salaries paid to employees of OTBT for purposes of determining industry standards. (*Id.*) Plaintiff also contends, incorrectly, that Izotov did not make any effort to evaluate whether any of the employees who worked for OTBT had base salaries in excess of industry standards. (*Id.*) However, Izotov never testified to this. Izotov testified that he was aware that commissions and bonuses paid to OTBT employees were within industry standards, but he never testified as to whether or not he examined or was aware if the employees' base salaries were in excess or within industry standards; this question, in fact, was never posed to him. (R. 127-1, Ex. J, Izotov Dep. at 27:21-30:14.) Brightstar asserts that Plaintiff has not met his burden of proving how much, if anything, should have been added back to OTBT's EBITDA that was in excess of base salary industry standards. (R. 143, Sealed Def.'s Resp. at 30.)

To support his claim, Plaintiff is essentially relying solely on Kalinoski's testimony that he was "not aware" of any analysis that was done to determine whether the employees' base salaries were within industry standards. Based on this "mere scintilla of evidence," *Wheeler*, 539 F.3d at 634, the Court cannot determine that Plaintiff has sufficiently proved that Brightstar did not evaluate whether any of its employees had salaries in excess of base salary industry standards. Nor has Plaintiff identified any employee whose salary was in excess of base salary industry standards, let alone the amount that was in excess that should have been added back in. Therefore, as a matter of law, the Court cannot conclude that Brightstar breached the SPA by ignoring the industry standard requirement. Accordingly, the Court denies Plaintiff's request for summary judgment on this issue.

## C. Whether Brightstar ignored the business operating expense requirement

The SPA provides that "business operating expenses allocated to [OTBT's] business based on a reasonable allocation by [Brightstar] consistent with allocations to [Brightstar's] other subsidiaries shall be included in the calculation of EBITDA. (R. 146, Pl.'s Rule 56.1 Resp. ¶ 44; R. 127-8, Ex. W, SPA at 148.) Thus, the parties agreed that business operating expenses charged to OTBT would be no greater than the amounts Brightstar charged to its other subsidiaries, otherwise the difference would be added back into OTBT's EBITDA. (R. 126, Sealed Pl.'s Mem. at 26.) Plaintiff argues that Brightstar breached the SPA by ignoring this business operating expense requirement. (*Id.*) In support, Plaintiff asserts that OTBT paid $2,298,927.00 to Brightstar and Tech Data for various services and management fees and charges during the Earn-Out period. (*Id.*) Plaintiff contends that Izotov testified that he did not compare the business operating expenses Brightstar allocated to its Affiliates. (*Id.*) Plaintiff also asserts that Kalinoski testified that Brightstar did not do a separate analysis to compare the business operating expenses allocated to OTBT with Brightstar's allocations to its other Affiliates. (*Id.*) Plaintiff argues that Izotov's and Kalinoski's testimony prove that Brightstar made no effort to determine whether the business operating expenses allocated to OTBT (including the $2 million in fees and charges) were similar to the ones allocated to Brightstar's other Affiliates.

Brightstar argues that the $2,298,927.00 was for "intra-company charges made between OTBT and other Brightstar affiliates, for actual services such as loaned employees, marketing services, and others." (R. 143, Sealed Def.'s Resp. at 31.) According to Brightstar, the SPA permits Brightstar, if it chose to, to allocate a portion of its own overhead expenses—costs to run Brightstar's operations as the holding company—to OTBT, provided it was consistent with the way Brightstar allocated overhead to its other Affiliates. (*Id.* at 31-32.) Brightstar contends that

it did not allocate any of its overhead expenses to OTBT, and therefore Izotov did not need to do any analysis comparing the operating expenses allocated to Brightstar's Affiliates. (*Id.*)

"Business operating expenses" is not defined in the SPA, and the parties do not provide the Court with any definition of what constitutes a business operating expense. Instead, the parties dispute the meaning of the term. According to Brightstar, "business operating expenses" only includes overhead expenses. (R. 143, Sealed Def.'s Resp. at 31.) According to Plaintiff, "business operating expenses" includes not only overhead expenses, but also intra-company charges. (R. 172-1, Pl.'s Reply at 18.) The Court finds that the term is susceptible to both parties' interpretations and thus is ambiguous. *See Miller v. Kase*, 789 So. 2d 1095, 1097-98 (Fla. Dist. Ct. App. 2001). In an effort to resolve the meaning of this ambiguous term, the Court looked to Florida case law and *Black's Law Dictionary*, *see Churchville v. GACS, Inc.*, 973 So. 2d 1212, 1215 (Fla. Dist. Ct. App. 2008), but was unable to find a working definition for "business operating expense." Additionally, neither party has provided the Court with any extrinsic evidence to support their interpretation of the term. *See PartyLite*, 895 F. Supp. 2d at 1233. Without any evidence, the Court is unable to discern the parties' original intent of the term when they executed the SPA. Thus, what exactly qualifies as a business operating expense remains a disputed material fact. *See Strama*, 793 So. 2d at 1132 ("Where the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment." (citation omitted)). The Court therefore cannot determine as a matter of law that Brightstar breached the SPA by ignoring the business operating expense requirement. Accordingly, the Court denies Plaintiff's request for summary judgment on this issue.

**V. Whether Brightstar Breached its Implied Duty of Good Faith and Fair Dealing**

In his supplemental complaint, Plaintiff alleges that Brightstar breached its implied duty of good faith and fair dealing by miscalculating the EBITDA. (R. 18-1, Supp. Compl. ¶ 3.) Specifically, Plaintiff argues that Brightstar was required to prepare the Earn-Out calculation in good faith and was given parameters for calculating the EBITDA. (R. 126, Sealed Pl.'s Mem. at 27-28.) Plaintiff contends that "instead of attempting to comply with [the] parameters [outlined in the SPA] and provide support for the expenses charged to [OTBT], Brightstar delegated its obligation to prepare the Earn-Out calculation to Izotov, who then prepared the Earn-Out Calculation without factoring in the items as required in the SPA-EBITDA definition." (*Id.* at 28.) Further, Plaintiff asserts that Brightstar "did nothing to confirm that the Earn-Out Calculation complied with the SPA." (*Id.*) Brightstar counters that Plaintiff's claim that Brightstar did nothing to review Izotov's Earn-Out calculation is refuted by the evidence, which shows that the calculation was reviewed by Brightstar's VP of Finance Bjorn Rektorli, Brightstar's counsel Brad Romig, and Mike Cost. (R. 143, Sealed Def.'s Resp. at 33.)

Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract. *Cnty. of Brevard v. Miorelli Eng'g, Inc.*, 703 So. 2d 1049, 1050 (Fla. 1997). "Because the implied covenant is not a stated contractual term, to operate it attaches to the performance of a specific or express contractual provision." *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 792 (Fla. Dist. Ct. App. 2005). Thus, "[t]here can be no cause of action for a breach of the implied covenant 'absent an allegation that an express term of the contract has been breached.'" *Id.* (quoting *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2001)). Where a contract vests a party with discretion, but provides no standards for exercising that discretion, the implied covenant of good

faith and fair dealing serves as a "gap-filling default rule." *Speedway SuperAmerica, L.L.C. v. Tropic Enters., Inc.*, 966 So. 2d 1, 3 (Fla. Dist. Ct. App. 2007) (Florida courts "have recognized that it 'is a gap-filling default rule,' which comes into play 'when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards.'" (quoting *Publix Super Markets, Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla Dist. Ct. App. 2004))). In filling the gaps, the implied covenant of good faith and fair dealing "limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." *Id.* (quoting *Cox. v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097-98 (Fla. Dist. Ct. App. 1999)); *see also Publix Super Markets*, 876 So. 2d at 655 ("[T]he implied covenant of good faith protects contracting parties' reasonable commercial expectations."). A claimant asserting a cause of action for breach of the implied covenant of good faith and fair dealing must allege "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1329 (11th Cir. 2012) (quoting *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 607 F.3d 742, 747 (11th Cir. 2010) (applying Florida law)).

Here, Izotov failed to add-back in the variable compensation when he calculated the Earn-Out, which as the Court explained above, constitutes a breach of the express terms of the SPA. Plaintiff has offered no evidence to prove, however, that Izotov consciously and deliberately ignored the specific directives in the SPA to add-back in the variable compensation. *See Resnick*, 693 F.3d at 1329. Instead, the evidence demonstrates that Izotov thought he was following the specific directives in the SPA. (R. 146, Def.'s Rule 56.1 Resp. ¶ 75.) Izotov

testified that he understood the EBITDA definition to require that bonuses and variable compensation be added back in only if they were in excess of industry standards. (*Id.*; *see also* R. 127-1, Ex. J, Izotov Dep. at 27:21-30:10.) Izotov's incorrect interpretation of the EBITDA definition, and consequently, his failure to add-back in the variable compensation, constitutes either an honest mistake at best, or bad judgment or negligence at worst. *See Resnick*, 693 F.3d at 1329. Because Plaintiff has offered no evidence to prove that Izotov failed to act in good faith when calculating the Earn-Out, the Court cannot find as a matter of law that Brightstar breached the implied covenant of good faith and fair dealing. Accordingly, the Court denies Plaintiff's request for summary judgment on this issue.

## VI. Whether Brightstar Breached the SPA by Refusing to Participate in the ADR Process

In his supplemental complaint, Plaintiff alleges that Brightstar breached the ADR Provision of the SPA and its implied duty of good faith and fair dealing by refusing to provide relevant documents and otherwise failing to participate in the ADR process. (R. 18-1, Supp. Compl. ¶¶ 3, 16, 22.) Brightstar seeks summary judgment in its favor on this claim because, according to Brightstar, Plaintiff waived the ADR Provision when it filed this lawsuit and, therefore, Brightstar could not have breached the ADR Provision or its implied duty of good faith. (R. 119, Def.'s Mem. at 36-37.) Plaintiff does not respond to Brightstar's arguments relating to this particular claim; instead, Plaintiff re-asserts his argument that Brightstar breached its implied duty of good faith and fair dealing by delegating the calculation of the Earn-Out to Izotov, who ignored the requirements of the EBITDA definition. (R. 150, Sealed Pl.'s Resp. at 18-19.) Additionally, in his own brief in support of his motion for summary judgment, Plaintiff does not address this particular claim alleged in his supplemental complaint. Instead, Plaintiff asserts that after discussions with opposing counsel, "the parties were able to eliminate

arguments related to . . . [his] allegations that Brightstar failed to provide the Applicable

Financials and failed to engage in the [ADR] procedure required under the SPA." (R. 126,

Sealed Pl.'s Mem. at 9 (citing R. 125-1, Ex. 4, Pl.'s Counsel's September 22, 2014 Letter).) In

the September 22, 2014 letter, Plaintiff informed Brightstar that he would not move for summary

judgment on his allegations that Brightstar breached the ADR Provision and failed to provide the

Applicable Financials, but emphasized that he was "not waiving and specifically reserve[d] his

right to assert" this claim at trial. (R. 125-1, Ex. 4, Pl.'s Counsel's September 22, 2014 Letter.)

Plaintiff's September 22, 2014 letter, however, is insufficient to reserve his right to later

assert arguments in support of his claim in light of Brightstar independently moving for summary

judgment on that claim. Notwithstanding the letter, Plaintiff was still required to respond to

Brightstar's argument that summary judgment in its favor is warranted on Plaintiff's claim that

Brightstar breached the ADR Provision and its implied duty of good faith. *See Robyns v.*

*Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1237 (7th Cir. 1997) ( "A party opposing a

summary judgment motion must inform the trial judge of the reasons, legal or factual, why

summary judgment should not be entered."). Because Plaintiff failed to respond to Brightstar's

argument and defend his claim, he is deemed to have abandoned his claim. *See Palmer v.*

*Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming the plaintiff's negligence claim

abandoned because he failed to delineate it in his brief in opposition to summary judgment);

*Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not

presented to the district court in response to summary judgment motions are waived); *YCB Int'l,*

*Inc. v. UCF Trading Co. Ltd.*, 904 F. Supp. 2d 870, 879-80 (N.D. Ill. 2012) (finding the

plaintiff's failure to defend a particular claim in response to the defendant's motion for summary

judgment constituted abandonment of the claim). Accordingly, the Court grants summary judgment in favor of Brightstar on Plaintiff's claim regarding the ADR Provision.

## VII. Whether Brightstar's Sale of Its Remaining Interest in OTBT Violated the SPA

Plaintiff argues for the first time in his brief in support of his motion for summary judgment that Brightstar's sale of its remaining 50% interest in OTBT to Tech Data prior to the Earn-Out being paid violated the SPA. (R. 126, Sealed Pl.'s Mem. at 28-29.) Brightstar correctly notes that Plaintiff did not plead this claim in either his complaint or supplemental complaint. (R. 143, Sealed Def.'s Resp. at 33.) New claims cannot be introduced at the summary judgment stage. *See Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997) (holding that it "is too late in the day to be adding new claims" at the summary judgment stage); *Teall v. City of Chi.*, 986 F. Supp. 1098, 1101 (N.D. Ill. 1997) ("It is well settled within the Seventh Circuit that a plaintiff cannot amend his complaint with a later filed brief."). Therefore, Plaintiff's unpled claim will not be addressed by this Court. *See Conner v. Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005) (affirming district court's decision not to consider a claim raised for the first time in plaintiff's response to a motion for summary judgment); *Komperada v. Hartford Life & Accident Ins. Co.*, No. 02 C 5359, 2003 WL 21148023 at *3 (N.D. Ill. May 14, 2003) (refusing to address claims plaintiff raised for the first time in her brief in support of her cross-motion for summary judgment); *Greisz v. Household Bank (Ill.)*, 8 F. Supp. 2d 1031, 1042 (N.D. Ill. 1998) (refusing to consider new allegations raised for the first time at the summary judgment stage because they were " not properly before the court"). Accordingly, the Court denies Plaintiff's request for summary judgment on this unpled claim.

## VIII. Whether Brightstar's Affirmative Defenses Survive Summary Judgment

Plaintiff moves for summary judgment on Brightstar's affirmative defenses. (R. 126, Sealed Pl.'s Mem. at 29.) Brightstar asserted nine affirmative defenses in response to Plaintiff's claims. (R. 95-1, Def.'s Amended Answer at 12-13.) Brightstar has withdrawn its first, seventh, and eighth affirmative defenses. (R. 126, Sealed Pl.'s Mem. at 30.) Additionally, the Court has already addressed in its above analysis Brightstar's second affirmative defense, relating to Brightstar's interpretation of Section 2.1(c)(i) of the SPA, and its ninth affirmative defense, relating to the Second Amendment. (*See* R. 95-1, Def.'s Amended Answer at 12-13.) Further, because the Court has found that Plaintiff has waived its claim that Brightstar breached the ADR Provision by failing to engage in the ADR process, the Court need not address Brightstar's fourth and fifth affirmative defenses, which relate to that particular claim. (*See id.*) Thus, all that remains for the Court to address are Brightstar's third and sixth affirmative defenses. (*See id.*)

### A.    Third affirmative defense

Brightstar's third affirmative defense alleges that Plaintiff failed to fulfill his obligations under the SPA and breached his obligations of good faith and fair dealing by: (1) making improper demands for documentation outside the scope of the agreed Applicable Financials; (2) improperly seeking confidential information from Brightstar and OTBT employees; (3) making improper demands for compensation based on a calculation of the Earn-Out that is not permitted by the SPA; and (4) surreptitiously filing suit in the midst of the dispute resolution process. (*Id.* at 12.)

As to the first alleged violation of the duty of good faith and fair dealing—that Plaintiff made improper demands for documentation—Plaintiff argues that Brightstar has not provided sufficient information to explain which demand made by Plaintiff was beyond the scope of the

Agreed Financials. (R. 126, Sealed Pl.'s Mem. at 31.) Brightstar offers no evidence in response to support its allegations that Plaintiff improperly demanded documents outside the scope of the Agreed Financials. Therefore, Brightstar's first alleged violation cannot survive summary judgment.

As to the second alleged breach of the duty of good faith and fair dealing—that Plaintiff improperly sought confidential information—Plaintiff argues that Brightstar does not provide information to explain what confidential information was improperly sought. (*Id.*) Brightstar offers no evidence in response to support this second alleged breach; Brightstar simply states that Kalinoski "testified extensively about Kirsch's unreasonable harassment of Izotov and solicitation of confidential information from Izotov after his boss, Kriete, told him to give Kirsch whatever he wanted." (R. 143, Sealed Def.'s Resp. at 36.) Brightstar's characterization of Kalinoski's testimony is not sufficient evidence to support its second alleged breach. Therefore, this second alleged breach cannot survive summary judgment.

Brightstar raises an additional argument pertaining to Plaintiff's handling of confidential information. Specially, Brightstar argues that Plaintiff violated the duty of good faith and fair dealing by sharing confidential information provided by Izotov with third-party accountants who had no right under the contract to receive the information. (*Id.* at 35.) Brightstar contends that Section 6.2 of the SPA[7] prohibits disclosure of confidential information without Brightstar's written consent, and Brightstar never gave its consent. (*Id.*) However, the ADR Provision in Section 2.1(c)(v) of the SPA provides that in the event there is a disagreement over what the correct Earn-Out calculation is, each party can appoint an independent accountant to review the

---

[7] Brightstar cites the incorrect SPA section. Section 6.1 is the section in the SPA that forbids disclosure of confidential information without Brightstar's written consent. (*See* R. 127-8, Ex. W, SPA at 180.)

Applicable Financials. (R. 127-8, Ex. W, SPA at 162.) Plaintiff argues that he shared the confidential information with his accountants for the purpose of evaluating the Earn-Out calculation, as permitted under Section 2.1(c)(v). (R. 172-1, Pl.'s Reply at 20 n.3.) Brightstar asserts that Plaintiff testified that he did not retain the accountants for purposes of invoking the ADR Provision, (R. 143, Sealed Def.'s Resp. at 35), but Brightstar mischaracterizes Plaintiff's testimony. Plaintiff in fact testified that he retained the accountants so that they could review the financial information and evaluate the Earn-Out calculation. (R. 120-1, Ex. 8, Kirsch Dep. at 300:22-301:06.) Because the ADR Provision specifically allows for independent accountants to review the confidential information, the Court finds that Plaintiff did not breach the SPA or violate his duty of good faith and fair dealing by sharing the information with his accountants. Summary judgment is therefore proper for this additional alleged breach.

As to the third alleged violation of the duty of good faith and fair dealing—that Plaintiff made improper demands for compensation based on a calculation of the Earn-Out that is not permitted by the SPA—the Court has already held that Plaintiff's demand that variable compensation be included in the Earn-Out was proper. Additionally, Brightstar has not provided any evidence to prove that Plaintiff's demand that employees' compensation in excess of base salary industry standards be included was made in bad faith. Therefore, Brightstar's third alleged violation cannot survive summary judgment.

Finally, as to the fourth alleged violation of the duty of good faith and fair dealing—that Plaintiff surreptitiously filed suit in the midst of the dispute resolution process—Plaintiff argues that it is "patently frivolous." (R. 126, Sealed Pl.'s Mem. at 31.) As the Court previously explained, a breach of the duty of good faith and fear dealing must be tied to an actual breach of a contractual provision. *See Snow*, 896 So. 2d at 792. Here, Brightstar has not explained what

part of the SPA Plaintiff breached by filing this lawsuit. Brightstar simply states that Plaintiff ignored the ADR Provision by filing the lawsuit, (R. 143, Sealed Def.'s Resp. at 36), but the ADR Provision does not forbid Plaintiff from suing Brightstar for a breach of the SPA. Thus, this fourth allegation also cannot survive summary judgment.

Accordingly, the Court grants summary judgment in favor of Plaintiff as to Brightstar's third affirmative defense.

### B.     Sixth affirmative defense

Brightstar's sixth affirmative defense alleges that Plaintiff's claims are barred by his breaches of Section 6.4[8] of the SPA: "On information and belief, Plaintiff has called or solicited actual or prospective customers of [OTBT] which existed on the Closing Day with respect to matters related to or competitive with the business of [OTBT] during the restricted period of Section 6.4." (R. 95-1, Def.'s Amended Answer at 13.) Plaintiff argues that Brightstar has no factual basis to sustain this affirmative defense. (R. 126, Sealed Pl.'s Mem. at 33.)

In support of its affirmative defense, Brightstar asserts that during the relevant period, Plaintiff was the director of sales for MNJ, a self-described "full service technology reseller providing access to cutting edge technology," and as director of sales, he led a sales team focused on reselling laptops and other items to enterprise customers.[9] (R. 143, Sealed Def.'s

---

[8] Section 6.4, which is labeled "Nonsolicitation of Employees and Customers," provides: "During the period commencing on the data of this Agreement and terminating one (1) year after the end of the Earn-Out Period (the "**Nonsolicitation Period**"), without the prior written consent of [Brightstar], . . . no Shareholder shall, directly or indirectly, for himself or for any other person . . . (b) call on or solicit any of the actual or prospective customers of [OTBT] which existed as of the Closing Date with respect to any matters related to or competitive with the business of [OTBT]." (R. 127-8, Ex. W, SPA at 181.)

[9] Brightstar acknowledges that Section 6.3 of the SPA carved out Plaintiff's right to work at MNJ in some capacity, but contends that Section 6.4 made clear that whatever Plaintiff did for MNJ, "it could not involve soliciting, directly or indirectly, prospective customers of OTBT

Resp. at 36.) But Brightstar has not provided any evidence to show which actual or prospective customers of OTBT Plaintiff called or solicited while working for MNJ. In fact, Kalinoski testified that the only information he knew of that supported this sixth affirmative defense was the fact that Plaintiff is the director of sales for MNJ, but that Brightstar could not get "information on whether or not he actually called on or sold any products to existing or prospective [OTBT] customers." (R. 126, Pl.'s Mem. at 33; R. 127-1, Ex. I, Kalinoski Dep. at 251:01-05.) The only evidence Brightstar offers are documents produced by MNJ which prove that in early 2013, Plaintiff communicated with GTSI, a reseller of IT equipment to the government. (R. 143, Sealed Def.'s Resp. at 36.) Brightstar contends that GTSI is "exactly the kind of customer OTBT targeted." (*Id.*) Other than its conclusory assertion, however, Brightstar has cited no evidence in the record to prove that GTSI was a prospective customer for OTBT. The mere fact that Plaintiff worked for MNJ and communicated with GTSI is insufficient evidence to support Brightstar's sixth affirmative defense. Accordingly, the Court grants summary judgment in favor of Plaintiff as to Brightstar's sixth affirmative defense.

IV.     **Whether the SPA Allows for the Recovery of Attorney's Fees**

The Indemnification Provision in Section 7.4 of the SPA provides, in relevant part, that:

> Each of the Shareholders . . . and [Brightstar] . . . agree to defend . . . indemnify, pay and hold harmless the other party . . . from and against any and all Indemnified Liabilities . . . .
>
> . . . "**Indemnified Liabilities**" means, collectively, any and all . . . expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any . . . judicial proceedings commenced or threated by any Person, . . . whether or not involving a third party claim, . . . that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement . . . .

during and for one year following the end of the Earn-Out Period." (R. 143, Sealed Def.'s Resp. at 36; *see* R. 127-8, Ex. W, SPA at 181.)

(R. 146, Def.'s Rule 56.1 Resp. ¶ 46; R. 127-8, Ex. W, SPA at 183.) Plaintiff argues that the Indemnification Provision allows for the prevailing party in this litigation to be awarded attorney's fees. (R. 126, Sealed Pl.'s Mem. at 33-35.) Brightstar argues that the Indemnification Provision does not meet the requirements under Florida law to allow for the award of attorney's fees to the prevailing party. (R. 119, Def.'s Mem. at 38-40.)

Under Florida law, "[a]n agreement for one party to pay another party's attorney's fees must unambiguously state that intention." *Civix Sunrise, GC, L.L.C. v. Sunrise Rd. Maint. Ass'n*, 997 So. 2d 433, 435 (Fla. Dist. Ct. App. 2008). If the agreement is "ambiguous, the court will not struggle by construction of the language employed to infer an intent for fees that has not been clearly expressed; nor will it allow intentions to indemnify another's attorney's fees to be ambiguously stated and then resolved by the finder of fact." *Sholkoff v. Boca Raton Cmty. Hosp., Inc.*, 693 So. 2d 1114, 1118 (Fla. Dist. Ct. App. 1997). The Eleventh Circuit, interpreting Florida law, has explained that where an indemnification clause in a contract provides indemnity including attorney's fees, and "would seem to apply not only to claims by third parties but also to suits between the parties, the Florida courts hold that the indemnification clause applies only to claims by third parties if, with respect to suits between the parties, the attorney's fees provision is not limited to prevailing parties." *Succar Succar v. Safra Nat'l Bank of N.Y.*, 237 Fed. App'x 526, 528 (11th Cir. 2007) (finding that the indemnification clauses in contracts between bank and investors applied only to claims brought by third parties, and not to actions between bank and investors, because the indemnification clauses did not limit the attorney's fee provisions to the prevailing party in suits between bank and investors); *see also Traylor Bros. v. Melvin*, 776 So. 2d 947, 948 (Fla. Dist. Ct. App. 2000) (denying attorney's fees to a prevailing party because the "indemnification clauses in the Lease Agreement d[id] not provide for an award of attorney's

fees to the prevailing party in litigation between the contracting parties"). In reaching this conclusion, the Eleventh Circuit relied on the Florida Supreme Court's decision in *Penthouse North Association, Inc. v. Lombardi*, 461 So. 2d 1350 (Fla. 1985). *Succar*, 237 Fed. App'x at 528. The court in *Penthouse* denied the prevailing party (the lessors) attorney's fees, finding that the indemnification provision in the contract between the lessors and the association applied only to actions between the lessors and third parties, and not to actions between the parties. 461 So. 2d at 1352-53. In so holding, the court stated that "[a]ccepting the lessor's contention would amount to accepting the incongruous theory that although the appellees [condominium associations] may be successful in their litigation, they would nevertheless have to satisfy their own judgment in addition to paying the lessor's costs. The law will not sanction such an anomaly." *Id.* at 1353 (quoting *Century Vill., Inc., v. Chatham Condominium Ass'ns*, 387 So. 2d 523, 524 (Fla. Dist. Ct. App. 1980)).

Here, just like in *Succar*, the Indemnification Provision does not on its face limit the award of attorney's fees to the prevailing party. Instead, read literally, the Indemnification Provision appears to require both parties to pay each others' fees, but Florida courts have expressly forbade interpretations of indemnification provisions that create such an "anomaly." *See Penthouse*, 461 So. 2d at 1353. Plaintiff argues that no anomaly is present here because if Brightstar is found to have breached the Representation and Warranty, Brightstar will be barred as a matter of law from enforcing the Indemnification Provision, and thus could not claim its fees from Plaintiff. (R. 126, Sealed Pl.'s Mem. at 35 (citing *Giller v. Cafeteria of S. Beach, Ltd.*, 967 So. 2d 240, 242 (Fla. Dist. Ct. App. 2007) ("One cannot both take advantage of contract provisions . . . and at the same time avoid another contract term or provision for which it has no use.")).) Plaintiff's argument is flawed, however, because it relies on the assumption that

Plaintiff will prevail in this case. If the converse is true and Brightstar prevails, the anomaly remains: Plaintiff would have to pay Brightstar's fees yet he could still enforce the Indemnity Provision himself and force Brightstar to pay his fees. Thus, the Indemnification Provision must be construed to apply only to third party claims because it does not unambiguously state that the prevailing party in suits between Shareholders and Brightstar can recover attorney's fees. *See Succar*, 237 Fed. App'x at 529. Accordingly, the Court denies Plaintiff's request for summary judgment as to his claim for attorney's fees and grants summary judgment in Brightstar's favor.

## V.     Whether Pre-Judgment Interest Should Be Awarded

Finally, Plaintiff argues that he has a right to prejudgment interest on any monetary award he receives. (R. 126, Sealed Pl.'s Mem. at 36.) Brightstar argues that the prejudgment interest issue is unripe for summary judgment. (R. 143, Sealed Def.'s Resp. at 38-39.)

Under Florida law, "the general rule in contract cases is that the prevailing party receives prejudgment interest on its award[.]" *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286, 1297 (11th Cir. 2002) (collecting cases). "Once damages are liquidated, prejudgment interest is considered an element of those damages as a matter of law, and the plaintiff is to be made whole from the date of the loss." *Broward Cnty. v. Finlayson*, 555 So. 2d 1211, 1213 (Fla. 1990) (quoting *Kissimmee Utility Auth. v. Better Plastics, Inc.*, 526 So. 2d 46, 47 (Fla. 1988)). This general rule, however, "is not absolute and may depend on equitable considerations." *Id.* "The weight of equitable considerations may foreclose any award of prejudgment interest at all, or may simply warrant a reduction in the amount to be awarded." *Blasland*, 283 F.3d at 1298 (internal citations omitted).

Here, Brightstar argues that prejudgment interest cannot be decided until the nature and extent of Brightstar's breach of the SPA, if any, is determined. (R. 143, Sealed Def.'s Resp. at

38-39.) Brightstar contends that depending on the extent of its liability, there could be "numerous equitable considerations [that] would militate against prejudgment interest." (*Id.* at 39.) The Court agrees with Brightstar that it is too early to decide the prejudgment interest issue at this stage because there are still other issues that remain pending. The Court will defer it's decision on whether Plaintiff is entitled to prejudgment interest until the case has been fully resolved and the exact amount of Plaintiff's award has been calculated.

## CONCLUSION

For the foregoing reasons, Brightstar's motion for partial summary judgment (R. 117) is GRANTED in part and DENIED in part. Plaintiff's motion for summary judgment (R. 124) is GRANTED in part and DENIED in part. Plaintiff's motion to strike (R. 174) is DENIED as moot. The parties are again, in light of this opinion, requested to exhaust all settlement possibilities for the remaining claims prior to the next status hearing, which will be held on January 27, 2015, at 9:45 a.m.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

Dated: January 13, 2015